**Julio SCATAMBULI; Geliane Scatambuli, Petitioners,**

**v.**

---

Eric H. HOLDER, Jr.,* Attorney
General, Respondent.

No. 08–1584.

United States Court of Appeals,
First Circuit.

Submitted Nov. 5, 2008.

Decided Feb. 25, 2009.

---

* Pursuant to Fed. R.App. P. 43(c)(2), Attorney General Eric H. Holder, Jr. has been substituted for former Attorney General Michael B. Mukasey as the respondent.

Jose A. Vazquez on brief for petitioners.

Kathryn L. DeAngelis, Trial Attorney, Office of Immigration Litigation, U.S. Department of Justice, Gregory G. Katsas, Assistant Attorney General, Civil Division, and Terri J. Scadron, Assistant Director, on brief for respondent.

Before LYNCH, Chief Judge, SELYA and BOUDIN, Circuit Judges.

LYNCH, Chief Judge.

Julio and Geliane Scatambuli, natives and citizens of Brazil, petition for review of the Board of Immigration Appeals's denial of their application for asylum and withholding of removal.

The Scatambulis arrived in the United States with false visas, obtained through an illegal alien smuggling operation, and upon their detention by U.S. immigration authorities, provided information to authorities regarding the smuggling ring. Petitioners then sought asylum protection and withholding of removal based on their claimed fear of persecution for their status as "government informants." The Immigration Judge and the BIA denied their claim. The Scatambulis argue that the BIA improperly relied on "social visibility" in determining that they were not members of a particular social group within the meaning of the Immigration and Nationality Act. 8 U.S.C. §§ 1101(a)(42)(A), 1231(b)(3)(A). We deny their petition.

## I.

On July 4, 2003, the Scatambulis sought admission to the United States at El Paso, Texas. They were detained by immigration officials at the border. On July 29, 2003, the Department of Homeland Security issued Notices to Appear ("NTA's") with two charges related to inadmissibility: first that petitioners were aliens who sought to procure a visa, other documentation, or admission to the United States by fraud or willful misrepresentation of a material fact, under 8 U.S.C. § 1182(a)(6)(C)(i); and second that petitioners lacked proper entry documentation

at the time of their application for admission, under § 1182(a)(7)(A)(i)(I).

Julio appeared in Immigration Court, with counsel, on September 8, 2003, and admitted all of the factual allegations made against him, although he denied any fraudulent conduct.

Julio submitted an application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") on September 15, 2003. The application named Geliane as a derivative beneficiary. The removal proceedings were consolidated. On November 19, 2003, the Scatambulis moved for a change of venue from El Paso to Boston and admitted the charges in their NTAs. The change of venue was granted, and hearings before the IJ occurred on July 28, 2005, March 8, 2006, and April 12, 2006.

In his asylum application affidavit, and in his testimony before the IJ, Julio explained that in May 2003, his brother Roberto Scatambuli referred him to Mr. X[1] in order to obtain tourist visas to come to the United States. Julio was told to go to Mr. X's office to drop off his and Geliane's passports along with processing fees of $300. Julio subsequently paid Mr. X and his associate Mr. Y an additional $11,100 to obtain the tourist visas, plane tickets from Brazil to Mexico City, and additional fees to travel from Mexico City to the United States. On their arrival in Mexico City, the Scatambulis met Mr. Y, who took them from Mexico City in a rental van to the border town of Juarez, Mexico. Mr. Y told them that they should never reveal to U.S. authorities who had helped them obtain their visas, because if they did Mr. X and Mr. Y would find them and kill them and their families.

When the Scatambulis were detained at the border, an officer told them that he believed their visas were fraudulent because a woman and her three children had attempted to cross the border that morning with similar visas and identical airline reservations. The Scatambulis were then placed in detention.

Julio testified that after about twenty days in detention, Special Agent Oscar Diaz visited him. Diaz asked Julio about how he and Geliane had come to the United States. Julio said he was told "that if [he] was to state the truth, the United States government would protect him." He therefore agreed to cooperate with Diaz. Julio testified that he gave Diaz photos and contact and bank account information about Mr. X and Mr. Y to help Diaz's investigation. Diaz met with the Scatambulis approximately six times. In return for their cooperation, the Scatambulis received work permits.

Julio further testified that he had told Diaz, "I . . . need the protection because these guys will kill me," and that Julio's neighbors had reported that Mr. X and Mr. Y were looking for him in Brazil.

Geliane's testimony before the IJ was similar to Julio's. She stated that Mr. X had threatened her and Julio that if they revealed information about Mr. X to American authorities, they "would be sorry." Geliane also stated that Mr. X told them that he could "get anything he wanted because he already had [their] address in Brazil" and that if they encountered any problems in their trip to the U.S., they "could not talk about [Mr. X] because then he would silence [them]." She testified that she gave Diaz the information she knew about Mr. X and the photos that she

---

1. There is no need to set forth in an opinion the identities of the persons the petitioners believe may harm them on return if those persons learn petitioners have been informants.

had taken during the trip from Brazil through Mexico of Mr. Y and the other travelers.

On July 28, 2006, the IJ issued an oral decision denying the Scatambulis' application for asylum, withholding of removal, and protection under the CAT, or in the alternative voluntary departure. The IJ found that the Scatambulis were "generally credible" but did not credit Julio's claim that he only realized his visa was fraudulent when he was stopped at the U.S. border. The IJ found that they had a subjectively genuine fear of returning, but that they had not met their burden of demonstrating that the persecution they feared was "on account of a protected ground." They claimed they had membership in a particular social group of "informants." Relying on *In re C–A–*, 23 I. & N. Dec. 951 (BIA 2006), the IJ found, inter alia, that petitioners' purported group lacked the visibility to be considered a social group for asylum purposes, explaining that "[t]he only people who know of their decision to provide information to the Department of Homeland Security are family members, and possibly also [Mr. X] and [Mr. Y]."

The IJ determined that because petitioners' asylum claim failed, their claim for withholding of removal failed as well, because the standard for withholding is more stringent than the standard for asylum. The IJ further found that the petitioners fear of torture was too speculative. The IJ denied their applications for voluntary departure, finding the petitioners ineligible because they failed to meet the requirement of one year of residency in the United Statutes prior to the issuance of an NTA. 8 U.S.C. § 1229c(b)(1)(A).

On April 14, 2008, the BIA affirmed the decision of the IJ in a three-page per curiam decision. Relying on its recent decisions, the BIA determined that the caselaw articulated considerations in addition to the requirement that applicants show membership in a group sharing a "common, immutable characteristic." The BIA stated, "[i]n each of these cases, we emphasized that the purported group's social visibility—i.e., the extent to which members of a society perceive those with the characteristic in question as members of a social group—is of particular importance in determining whether an alien is a member of a claimed particular social group." The BIA concluded:

We find that the [IJ], citing our holding in *Matter of C–A–* ... properly applied the "social visibility" factor in determining that "informants against a Brazilian smuggling ring" are not a particular social group. Persons who act as informants to the United States government have not been shown to be part of a socially visible group within Brazilian society, and [Julio] does not allege that he possesses any outward characteristics that would cause others in Brazilian society to recognize him as one who has acted as an informant with government authorities. Witnesses in criminal cases, or other investigations, do not share a characteristic which identifies them to others. Of course, individuals who inform on others in criminal or other investigative matters may face risks from the individuals who have been informed upon. But such risk would arise from an individualized reaction of the persons informed upon to the specific behavior of the informant.

The BIA also upheld the IJ's determination that Julio had failed to establish that if he returned to Brazil, Mr. X and Mr. Y would be able to bribe Brazilian police who would then "subject him to punishment reaching the level of torture."

## II.

■ We review the BIA's findings of fact under the deferential substantial evidence standard. *Budiono v. Mukasey*, 548 F.3d 44, 48 (1st Cir.2008). We accept the BIA's findings so long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Sharari v. Gonzáles*, 407 F.3d 467, 473 (1st Cir.2005) (quoting *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)) (internal quotation marks omitted). We reverse only if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also, e.g., Chikkeur v. Mukasey*, 514 F.3d 1381, 1382–83 (1st Cir.2008). "When the BIA adopts the IJ's opinion and discusses some of the bases for the IJ's decision, we have authority to review both the IJ's and the BIA's opinions." *Ouk v. Gonzales*, 464 F.3d 108, 110 (1st Cir.2006).

■ With respect to the BIA's legal interpretations, we review de novo, *Elien v. Ashcroft*, 364 F.3d 392, 396 (1st Cir.2004), but we nonetheless give substantial deference to the BIA's interpretations of the underlying statutes and regulations according to administrative law principles, *id.; see also INS v. Aguirre–Aguirre*, 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999)("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context."); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "When a statute is silent or ambiguous, therefore, we uphold the implementing agency's statutory interpretation, provided it is 'reasonable' and consistent with the statute." *Elien*, 364 F.3d at 397.

■ To qualify for asylum, an alien bears the burden of proving that he has suffered past persecution or has a well-founded fear of future persecution based on one of the statutorily protected factors. *See, e.g., Budiono*, 548 F.3d at 48; *see also* 8 U.S.C. § 1101(a)(42)(A) (defining "refugee" as one who suffers or fears persecution on the basis of "race, religion, nationality, membership in a particular social group, or political opinion"). The INA allows an alien to avoid removal by demonstrating that his "life or freedom would be threatened in [the destination] country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

■ Although the threshold of eligibility for withholding of removal is similar to the threshold for asylum, withholding requires a higher standard. *See, e.g., Sinurat v. Mukasey*, 537 F.3d 59, 62 (1st Cir.2008). Withholding of removal requires a showing "that an alien is 'more likely than not' to face persecution" on account of a protected ground. *Datau v. Mukasey*, 540 F.3d 37, 42 (1st Cir.2008) (citing *Zheng v. Gonzales*, 416 F.3d 97, 101 n. 3 (1st Cir.2005)); *see also* 8 C.F.R. § 1208.16(b)(2). The central issue here is the relevance of social visibility for determining persecution on account of membership in a particular social group.

In *In re Acosta*, decided in 1985, the BIA explained that a particular social group is one unified by some characteristic that is either (1) "beyond the power of an individual to change" or (2) "so fundamental to individual identity or conscience that it ought not be required to be changed." 19 I. & N. Dec. 211, 233 (BIA 1985), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987).[2]

---

**2.** Before the BIA announced its new standards in *In re C–A–,* our case law had adopted

The BIA has since refined its social group definition. *In re C–A–*, 23 I. & N. Dec. 951. It is that definition which applies here. *In re C–A–* explained that " 'persecution on account of membership in a particular social group' refers to 'persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic.' " *Id.* at 955, 2006 WL 1977492 (quoting *In re Acosta*, 19 I. & N. Dec. at 233). *In re C–A–* found that noncriminal informants who had passed on information concerning a drug cartel to the Colombian government did not have the kind of shared past experience to qualify for asylum on the basis of membership in a particular social group. *Id.* at 957, 2006 WL 1977492. Here, the BIA held the IJ committed no error of law in applying this precedent.

The BIA has construed *In re C–A–* to stand for three factors in addition to the immutability requirement for defining a social group. *See In re A–M–E & J–G–U–*, 24 I. & N. Dec. 69, 74–76 (BIA 2007). In addition to immutability, the BIA requires that a "particular social group": (1) have "social visibility," meaning that members possess "characteristics ... visible and recognizable by others in the [native] country," *In re C–A–*, 23 I. & N. Dec. at 960; (2) be defined with sufficient particularity to avoid indeterminacy, *In re A–M–E & J–G–U*, 24 I. & N. Dec. at 76; *In re C–A–*, 23 I. & N. Dec. at 957; and (3) not be "defined *exclusively* by the fact that its members have been targeted for persecution," *In re C–A–*, 23 I. & N. Dec. at 960 (quoting U.N. High Commissioner for Refugees guidelines on international protection) (emphasis in original); *In re A–M–E*

& *J–G–U*, 24 I. & N. Dec. at 74. In the case of the Colombian confidential informants, *In re C–A–* noted that "the very nature of the conduct at issue is such that it is generally out of the public view .... [and] visibility is limited to those informants who are discovered." 23 I. & N. Dec. at 960.

The BIA has continued to apply social visibility analysis in later cases, determining that "no particular social group" exists for individuals seeking protection as "affluent Guatemalans," *In re A–M–E & J–G–U*, 24 I. & N. Dec. at 75–76, or for Salvadoran youths who had rejected or resisted criminal gang recruitment efforts, *In re S–E–G–*, 24 I. & N. Dec. 579 (BIA 2008), or for young Hondurans resistant to gang membership, *In re E–A–G–*, 24 I. & N. Dec. 591 (BIA 2007).

■ A number of our sister circuits have adopted the BIA's use of social visibility as a relevant criterion. *See, e.g., Davila–Mejia v. Mukasey*, 531 F.3d 624, 629 (8th Cir.2008) (holding that status as "competing family business owners" did not give petitioners "sufficient social visibility to be perceived as a group by society"); *Arteaga v. Mukasey*, 511 F.3d 940, 945 (9th Cir.2007) (concluding that criminal gang tattoos that made petitioner visible to police or other gang members did not make petitioner part of a particular social group); *Ucelo–Gomez v. Mukasey*, 509 F.3d 70, 73 (2d Cir.2007) (per curiam) (affirming rejection of social group claim based on status as affluent Guatemalans who alleged they were targeted because of their wealth); *Castillo–Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1197 (11th Cir.2006)

the "immutable or fundamental" characteristic test set forth in *Acosta*. *See Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir.1993) (relying on "common, identifiable and immutable characteristics" to find that a nuclear family

constitutes a social group); *Ananeh–Firempong v. INS*, 766 F.2d 621, 626 (1st Cir.1985) (applying *Acosta* to determine that family relations can be the basis of a social group claim).

(upholding BIA decision in *In re C–A–* that non-criminal drug informants were not a particular social group). We agree that it is relevant to the particular social group analysis.

Moreover, several circuits have rejected the proposition that noncriminal informants constitute a particular social group. *See, e.g., Forero–Arias v. Mukasey,* 283 Fed.Appx. 518, 520 (9th Cir.2008) (mem.) (finding paid informants against Colombian drug cartels did not constitute a particular social group for purposes of withholding); *Patel v. Att'y Gen.,* 278 Fed.Appx. 227, 230 (3d Cir.2008) (rejecting petitioners' "purported group of non criminal informants from India who have cooperated extensively with law enforcement agencies in the United States"); *Castillo–Arias,* 446 F.3d at 1197.

This circuit has noted the relevance of the visibility of membership in a social group in the asylum context. *Ang v. Gonzales,* 430 F.3d 50, 57 (1st Cir.2005). *Ang* explained that the Cambodian petitioner was "no longer a *visible* member of the social group that he claimed might be the object of persecution," which undercut his claim for asylum based on social group membership. *Id.* (emphasis added). *Cf. Amilcar–Orellana v. Mukasey,* 551 F.3d 86, 91 (1st Cir.2008) ("We have no need to reach the broader questions regarding the BIA's use of a social visibility test in its definition of a particular social group.").

■ The Scatambulis attempt to distinguish *In re C–A–* on the grounds that the informants in *In re C–A–* passed on information in a social setting and that the

information passed on related to events that had occurred years earlier. The Scatambulis argue that *In re C–A–* does not reach their case because they conveyed the information in an official context and told Diaz about current alien smugglers who had threatened them. This case does not present the broad issue of whether informants who voluntarily provide information about illegality to law enforcement can ever be members of a particular social class. Even were that so, the BIA's determination that *these particular informants* lacked social visibility is based on substantial evidence.

To the extent petitioners are arguing the BIA is precluded from considering the visibility of a group or of an individual's association with that group, we reject the claim. As the IJ found, the universe of those who knew of the petitioners' identity as informants was quite small; the petitioners were not particularly visible.

In particular, it is not necessary in this case for us to explore whether there is any tension between looking to the visibility of a particular social group and the requirement that members of a group share an immutable or fundamental characteristic. *Silva v. Ashcroft,* 394 F.3d 1, 5 (1st Cir. 2005). Nor does this case, on its facts, raise any prospect that the informant informs based on his or her particular political opinions.[3]

The BIA also determined that, as informants, the petitioners' fear was premised largely on retaliation based on the "individualized reaction of the persons informed upon to the specific behavior of the infor-

---

**3.** Petitioners also argue that informants have been found eligible for asylum, relying on, inter alia, *Mejia v. Ashcroft,* 298 F.3d 873 (9th Cir.2002) (finding alien eligible for asylum on the basis of political opinion). This argument does not help them. Indeed, informants have been recognized as political refugees, *see id.*

at 877–78, but the Scatambulis never sought asylum based on their political opinion. The IJ expressly found that "there is no evidence that they acted as informants because of their political opinion, or that [Mr. X] or his associates will harm them because of their political beliefs."

mant." Substantial evidence in the record supports this finding that the Scatambulis' fear was based on their particular interactions with Mr. X and Mr. Y. "The INA is not intended to protect aliens from violence based on personal animosity." *Romilus v. Ashcroft,* 385 F.3d 1, 6 (1st Cir.2004).

■ The BIA reasonably found that as informants to U.S. authorities, nothing identified the Scatambulis as part of a group of informants to the Brazilian police. The BIA further supportably found that there was no evidence presented that linked Mr. X and Mr. Y to the Brazilian police, other than the Scatambulis' speculation. To sustain a claim of persecution based on social group membership, there must be evidence of mistreatment involving governmental actors. *Silva,* 394 F.3d at 7 ("Action by non-governmental actors can undergird a claim of persecution only if there is some showing that the alleged persecutors are in league with the government or are not controllable by the government."). Here, substantial evidence supports the BIA's finding that the link between the information the Scatambulis provided and possible mistreatment by the Brazilian police was highly uncertain.

■ Finally, petitioners also ask for relief by granting relief under the CAT, but they do not argue either point in their brief. Without more, the claims are waived. *Zeru v. Gonzales,* 503 F.3d 59, 66 n. 4 (1st Cir.2007).

We *deny* the petition for review.