# United States Court of Appeals
## For the First Circuit

No. 09-1229

MAGUETTE FAYE,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Boudin and Howard, Circuit Judges.

David L. Yavner on brief for petitioner.
John D. Williams, Trial Attorney, Office of Immigration
Litigation, Tony West, Assistant Attorney General, Civil Division,
and Russell J. E. Verby, Senior Litigation Counsel, Office of
Immigration Litigation, on brief for respondent.

September 2, 2009

**LYNCH**, **Chief Judge**.  Maguette Faye, of Senegal, petitions for review of the Board of Immigration Appeals's ("BIA") denial of her application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  We deny her petition.

## I.

Maguette Faye entered the United States on October 22, 2000, on a six-month tourist visa, which she overstayed. Immigration authorities issued a Notice to Appear on July 10, 2003. Faye admitted the facts in the Notice to Appear, and the Immigration Judge ("IJ") found her removable.

Faye filed for asylum on January 18, 2005, after the one-year filing deadline.  She claimed she would be persecuted in Senegal for her religious beliefs and because she is a member of a persecuted social group in Senegal.  Specifically, she claimed membership in the following alleged social group: "women who had a child out of wedlock/are considered adulterers because they gave birth to a child allegedly not their husband's/have been abused by their husbands."  A.R. 4.  Faye also sought withholding of removal and protection under the CAT on the same grounds or, alternatively, voluntary departure.

We summarize Faye's testimony before the IJ.  Faye and her family are Muslims.  Faye testified that she first experienced persecution when she gave birth to a child out of wedlock in 1990.

-2-

When her father learned she was pregnant, he left the family and did not return until after the baby was born. Her mother and brothers blamed her for his departure and for disgracing the family, and they beat her during her pregnancy to punish her. Faye did not report this abuse to any government authorities because the abusers were family members. Her family, however, allowed Faye and her child to live in their house for ten more years, and she did not say the beatings continued.

In 1996 Faye's father forced her to marry her first cousin, Ibrahima Seck. Faye disliked Seck but feared her family would beat her or evict her if she refused. Seck forced her to have sex with him throughout their marriage. When Faye resisted, Seck, a large man, beat, slapped, or choked her. Faye never reported Seck to the police because he was "of my family." Faye and Seck had a son, her second child, in 1997. Faye wanted a divorce, but Seck would not agree.

Once she left Senegal, Faye called Seck, told him she was in the United States, and asked again for a divorce. Seck visited the United States for a week in December 2002. Faye allowed him to sleep two nights in her living room because she hoped he would agree to a divorce. During his visit, Seck again raped Faye. Faye did not report the rape to police because she feared consequences, including on her status in the United States. Faye and Seck divorced in 2003.

Faye became pregnant during Seck's visit to the United States, but when she told Seck, he denied he could be the father after only one sexual encounter. Faye admitted she was still married to Seck in 2002 and that the child, her third, was not born out of wedlock. According to Faye, however, her family and Senegalese society would believe Seck, not Faye, and consequently would view the child as illegitimate and Faye as an adulterer. Faye testified that in Senegal, families punish adulterers by beating or killing them; she also feared her family would evict her if she returned. Faye did not believe she could avoid her family by moving elsewhere in Senegal because they would find her when she reunited with her children.

Faye also presented a one-page State Department country report from Senegal that stated 87 percent of 515 women interviewed were domestic violence victims. The report found that victims rarely reported abuse and police were reluctant to intervene in domestic matters. It noted that "[w]omen faced pervasive discrimination, especially in rural areas where Islamic and traditional customs . . . were strongest."

Finally, Faye presented a psychologist's report to explain her filing delay. The psychologist found Faye suffered from generalized anxiety disorder and major depressive disorder, which made her hesitant to make important decisions like filing for asylum.

-4-

The IJ issued an oral opinion on September 13, 2005. He refused to find Faye's mental illness was an "extraordinary circumstance[]" excusing her delay, 8 U.S.C. § 1158(a)(2)(D) (2006), and so he held her asylum claim was pretermitted. The IJ also rejected her withholding of removal claim. He found Faye credible but found no "persuasive evidence" that Faye would face persecution if she returned to Senegal. The IJ saw no evidence that Faye would be considered an adulterer for having her third child while married to Seck; even if her family did consider her an adulterer, they did not evict her after she had her first child out of wedlock. He also concluded Faye could avoid her family by moving to another part of Senegal. Finally, the IJ rejected her claim under the CAT, holding that no evidence showed the Senegalese government would torture her or consent to her being tortured. The IJ granted Faye's request for voluntary departure.

On August 1, 2009, the BIA reversed the IJ's ruling that Faye's asylum claim was pretermitted, holding Faye demonstrated an "exceptional circumstance" excusing her delay, a mental disability. But it determined the error was harmless because Faye failed to prove she had been or would be persecuted based on membership in a protected social group. Although the country report observed widespread domestic abuse, the BIA noted the report did not treat women who were adulterers or had children out of wedlock as particularly persecuted; in fact, the report did not mention them.

-5-

The BIA also affirmed the IJ's dismissal of Faye's CAT claim because no evidence showed the Senegalese government would torture her or permit her to be tortured. It granted Faye voluntary departure.

Faye petitioned for review. This court granted the government's unopposed motion to remand the case to the BIA to further consider whether Faye was a member of a protected social group.

The BIA issued a new decision, from which this petition for review is taken, on January 16, 2009. It again excused Faye's filing delay but ruled that Faye had not proven membership in a legally protected social group, to wit, "women who had a child out of wedlock/are considered adulterers because they gave birth to a child allegedly not their husband's/have been abused by their husbands." The BIA explained that a social group has (1) shared characteristics making it socially visible and (2) particular and well-defined boundaries. It held Faye's proposed group failed this test for several reasons, of which we mention only a few. First, the BIA held the proposed group was too "amorphous" because society would not generally recognize Faye as an adulterer or a woman who had a child out of wedlock. Second, the group of "women who had a child out of wedlock/are considered adulterers because they gave birth to a child allegedly not their husband's/have been abused by

-6-

their husbands" did not provide well-defined boundaries for determining the group's membership.

The BIA also denied Faye's asylum and withholding of removal claims because Faye could avoid further harm by moving away from her family when she returned to Senegal. Finally, the BIA denied Faye's claim under the CAT because she failed to demonstrate "she would be tortured by or with the acquiescence of the Senegalese government[]." It again granted Faye voluntary departure. Faye timely petitioned for review.

## II.

We review the BIA's findings of fact for substantial evidence, accepting those findings as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Shahari v. Gonzáles, 407 F.3d 467, 473 (1st Cir. 2005) (quoting INS v. Elias Zacarias, 502 U.S. 478, 481 (1992)) (internal quotation marks omitted). When the BIA adopts parts of the IJ's opinion, we also review those parts of the IJ's opinion. Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004).

We review the BIA's legal interpretations de novo, but we give "substantial deference to the BIA's interpretations of the underlying statutes and regulations according to administrative law principles." Scatambuli v. Holder, 558 F.3d 53, 58 (1st Cir. 2009). When statutes are silent or ambiguous, we uphold the BIA's reasonable interpretation of them. Id.

Aliens seeking asylum must prove they have suffered past persecution or have a well-founded fear of future persecution because of their "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); id. § 1231(b)(3)(A); Ratnasingam v. Holder, 556 F.3d 10, 13 (1st Cir. 2009). Aliens seeking withholding of removal must meet a higher burden of proof; they must show that it is more likely than not they will suffer persecution because of a protected ground. Datau v. Mukasey, 540 F.3d 37, 42 (1st Cir. 2008).

Faye seeks asylum and withholding of removal based on two protected grounds, religion and membership in a social group. She specifically claims membership in the social group, "women who had a child out of wedlock/are considered adulterers because they gave birth to a child allegedly not their husband's/have been abused by their husbands." The Immigration and Nationality Act does not define "social group," and the term is unclear. See In re C-A-, 23 I. & N. Dec. 951, 955-57 (B.I.A. 2006) (describing disagreement among courts and the United Nations). We therefore show some deference to the BIA's interpretation of the term.

The BIA has held that members of a social group must share a common, immutable characteristic, either innate or based on past experiences. Ruiz v. Mukasey, 526 F.3d 31, 36 (1st Cir. 2008). That characteristic should make the group (1) generally recognizable in the community and (2) sufficiently particular to

-8-

define the group's membership. In re A-M-E & J-G-U, 24 I.& N. Dec. 69, 74 (B.I.A. 2007); Scatambuli, 558 F.3d at 59. Whether a group meets the first test, the "social visibility" test, depends on the country and the persecution feared. In re A-M-E & J-G-U-, 24 I.& N. Dec. at 74; see also Scatambuli, 558 F.3d at 60 (holding informants who feared retaliation by two private individuals were not sufficiently visible in Brazilian society). "Although a social group cannot be defined exclusively by the fact that its members have been subjected to harm," courts may consider past harm when considering a group's social visibility. In re A-M-E & J-G-U-, 24 I.& N. Dec. at 74.

In In re A-M-E & J-G-U-, for example, the BIA ruled that "affluent Guatemalans" were not a social group because they failed both the social visibility and particularity tests. A country report found widespread violence against Guatemalans of all economic classes, and the BIA concluded no evidence showed "societal perception would be otherwise." Id. at 75. The BIA also found terms like "wealthy" and "affluent" were "too amorphous to provide an adequate benchmark for determining group membership." Id. at 76.

Substantial evidence supports the BIA's conclusion that Faye similarly failed to show her proposed group is socially visible and sufficiently particular. Faye presented almost no evidence of how Senegalese society views her proposed group. Her

-9-

testimony focused, rather, on how her family would view her because Seck denies he is the father of her third child. But she did not explain how Senegalese society generally would perceive her and women in a similar position. She did not describe experiences being persecuted or shunned by anyone in Senegal other than her family; indeed, Faye admitted she told no one that her family and Seck were abusing her.

Even the one page from the country report she submitted, as the BIA pointed out, does not mention women perceived as adulterers or mothers of children born out of wedlock. This report is simply too general to provide evidence that "women who had a child out of wedlock/are considered adulterers because they gave birth to a child allegedly not their husband's/have been abused by their husbands" is a recognized social group in Senegal.

We cannot displace the BIA's determination that Faye's proposed group is not sufficiently particular because it is difficult to identify women whom society would consider "adulterers" who "had a child out of wedlock." Faye's story demonstrates how these terms are ambiguous. She admits that her second and third children were not born out of wedlock. It would be difficult to determine when similar women are nevertheless perceived in Senegalese society as adulterers with illegitimate children. We affirm the BIA's decision that Faye failed to meet

her burden of showing she is eligible for asylum based on membership in a social group.

Turning to Faye's asylum claim alleging persecution because of her religious beliefs, we also have no basis to reverse the BIA's decision. Nothing in the record discusses Faye's beliefs, and she has presented no evidence showing she was persecuted because of them.

The BIA's denial of Faye's claim under the CAT also stands. Applicants for protection under the CAT must show it is more likely than not they will be tortured if removed to their destination country. 8 C.F.R. § 208.16. Torture is "severe pain or suffering" that a government official inflicts or consents or acquiesces to. 8 C.F.R. § 208.18(a)(1).

The IJ and BIA concluded Faye failed to prove the Senegalese government would torture her or permit her to be tortured if she returned to Senegal. Faye did not report her abuse to authorities, and the report's cursory observation that the government is reluctant to intervene in domestic disputes is not a sufficient link to the Senegalese government. See, e.g., Dianie v. U.S. Att'y General, 293 Fed. App'x 170, 174 (3d Cir. 2008) (finding no "pattern or practice of governmental acquiescence to domestic abuse" despite evidence, including U.S. government reports, showing "the judicial procedure is skewed against women who complain of domestic abuse") (internal quotation marks omitted.

The petition for review is <u>denied</u>.