# United States Court of Appeals
## For the First Circuit

No. 09-1208

HENRY EDGARDO MAYORGA-VIDAL,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General of the United States,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lipez, <u>Circuit Judge</u>,
Souter,[*] <u>Associate Justice</u>,
and Howard, <u>Circuit Judge</u>.

<u>Ilana Greenstein</u>, with whom <u>Maureen O' Sullivan</u>, <u>Jeanette Kain</u> and <u>Kaplan, O'Sullivan & Friedman, LLP</u> were on brief, for petitioner.
<u>Corey L. Farrell</u>, Attorney, Office of Immigration Litigation, United States Department of Justice, Civil Division, with whom <u>Tony West</u>, Assistant Attorney General, Civil Division and <u>Greg D. Mack</u>, Senior Litigation Counsel, were on brief, for respondent.

March 16, 2012

---

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**HOWARD**, <u>Circuit Judge</u>.  In 2002, petitioner Henry Edgardo Mayorga-Vidal, a native and citizen of El Salvador, attempted to enter the United States without authorization.  He was detained and placed in removal proceedings, where he initially denied that he was removable.  He also sought asylum, withholding of removal and protection under the Convention Against Torture ("CAT").  In support of his asylum and withholding requests, Mayorga-Vidal claimed that he would suffer future persecution if returned to his homeland, based on two statutorily-protected grounds.  <u>See</u> 8 U.S.C. § 1101(a)(42)(A).  The first was his purported membership in a "particular social group," defined by him as young Salvadoran men who have resisted gang recruitment and whose parents are unavailable to protect them.  <u>See</u> <u>id</u>.  The second ground was his alleged anti-gang, pro-establishment "political opinion."  <u>See</u> <u>id</u>. He sought CAT relief on the ground that, if repatriated, he would face gang violence for which the government would be responsible. All three requests for relief failed before both the Immigration Judge (IJ) and the Board of Immigration Appeals (BIA),[1] and Mayorga-Vidal now petitions for judicial review.  After a careful review of the final agency orders and the underlying record, we deny the petition.

---

[1]This case was heard by different IJs on two occasions and also was twice reviewed by the BIA.  Both IJs credited the petitioner's factual account, and these findings were left undisturbed by the two BIA decisions.

## I.  Background

We summarize the facts as provided in the agency decisions and as otherwise undisputed by the parties.  Mayorga-Vidal was born in El Salvador in 1984.  By 1998, his parents had left the country for the United States, leaving him in the care of his aunt and other family.  Many parents made a similar choice in the wake of the country's civil war, and El Salvador later experienced wide-spread gang problems.

Mayorga-Vidal's family life in his aunt's household was less than ideal, and, apparently, none of the extended family members took an interest in caring for him.  Around the time that Mayorga-Vidal was 14 or 15 years old, gang members of the "Mara 18" approached him in the street and attempted to recruit him, but he declined to join their ranks.  Upon the arrival of some of his friends, the gang fled.  This encounter would not be the last.  Different members of the Mara 18 approached him on several more occasions, demanding that he join the gang, and when he refused, they would tell him to be "very careful."  During one encounter, the gang members threatened to beat him, and, still, he declined gang membership.

At one point, a neighbor recommended to Mayorga-Vidal that he join a church group as an alternative to membership in a street gang and as a means of keeping himself safe from gang intimidation.  He did so and participated in church activities for

about a year and a half.  During this time, his contact with gang members was minimal because he avoided situations that would force an encounter.  Some contact occurred, however, when Mayorga-Vidal visited some of his cousins who were active gang members.

In 2001, the petitioner experienced his final confrontation with the Mara 18, during which gang members told him that if they ever found him alone they would kill him.  The gang's threats resonated with Mayorga-Vidal because he and his family believed that the Mara 18 had killed his cousin who had been a member of a rival gang.  He did not report his encounters to the police out of fear of gang retaliation.  Five months after his last gang encounter, Mayorga-Vidal left for the United States in February 2002.  He was 17 years old at the time.

At his removal hearing, Mayorga-Vidal gave his personal account, and he presented expert testimony and documentary evidence about country conditions in El Salvador.  The evidence showed that gang violence was a pervasive problem in El Salvador, touching all segments of the population.  Reports also indicated that the government had made efforts to combat the gang stronghold, including the creation of an anti-gang task force which deployed hundreds of military personnel to high crime areas.

Despite such efforts, gang violence continued to be a serious, wide-spread problem in El Salvador.  Two expert witnesses testified that the Salvadoran police were ineffectual, with one

-4-

stating that some police officers were actively involved in gang activity. One also testified that Mayorga-Vidal's status as a youth without family support would make him a prime target for gang recruitment, and that if he refused to join a gang he could be threatened, intimidated, beaten, or killed.

Ultimately, the IJ found Mayorga-Vidal removable, denied his requests for relief, and ordered him removed to El Salvador (2004 IJ decision). This decision was summarily affirmed by the BIA (2005 BIA decision), and Mayorga-Vidal petitioned this court for review. Before appellate briefing was complete, however, on the government's unopposed motion, the matter was remanded for the agency to consider the claim of "political opinion" persecution, an issue left undecided in the 2004 IJ decision. The IJ accepted all the evidence from the first hearing, as well as additional testimony from Mayorga-Vidal. The petitioner conceded removability before the IJ, and after denying his claim of "political opinion" persecution, the IJ again ordered Mayorga-Vidal removed (2007 IJ decision). In an order that included brief written analysis, the BIA affirmed the second IJ's decision and also reaffirmed its previous dismissal of Mayorga-Vidal's claim of "social group" persecution (2009 BIA decision). This timely petition followed.

## II. Discussion

We review the agency's findings of fact under a deferential, "substantial evidence" standard, and we give respect to its findings as long as they are supported by the record on the whole. Scatambuli v. Holder, 558 F.3d 53, 58 (1st Cir. 2009); Touch v. Holder, 568 F.3d 32, 38 (1st Cir. 2009); see 8 U.S.C. 1252(b(4)(B). De novo review is accorded to legal conclusions, with some deference accorded the agency's statutory interpretation in line with principles of administrative law. Scatambuli, 558 F.3d at 58; see INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25 (1999); Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). When a statute is silent or ambiguous, "we uphold the implementing agency's statutory interpretation, provided it is 'reasonable' and consistent with the statute." Scatambuli, 558 F.3d at 58.

The procedural path of this case results in the following review of the agency orders. We review the 2009 BIA decision in tandem with the 2004 IJ decision for the "particular social group" claim of future persecution,[2] and the 2009 BIA decision together

---

[2]The entirety of the IJ's analysis in its 2004 decision regarding the "social group"-based claims may be reviewable, given the 2007 BIA summary affirmance of that decision. The BIA, however, revisited sua sponte the "social group" analysis in its 2009 decision, and we need not consider the extent to which this decision may have supplanted the BIA's 2007 summary affirmance because the reasons provided in its later decision adequately supported its dismissal of the petitioner's claim of "social group" persecution.

with the 2007 IJ decision for the "political opinion" claim of future persecution.  Our review of the CAT claim rests on the 2004 IJ decision as summarily affirmed by the 2005 BIA decision.  See, e.g., Villa-Londono v. Holder, 600 F.3d 21, 23 (1st Cir. 2010) (stating that where the BIA adopts portions of the IJ's decision while adding its own comments, appellate court reviews both the IJ's opinion and the BIA's decision).

### Asylum and Withholding of Removal

To be eligible for asylum, an alien must establish that he has a well-founded fear of future persecution if repatriated (a showing of past persecution creates a rebuttable presumption of a well-founded fear), on account of a statutorily-protected ground: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. 1101(a)(42)(A); see Mendez-Barrera v. Holder, 602 F.3d 21, 25 (1st Cir. 2010) (providing legal framework regarding past persecution, and explaining that a well-founded fear of future persecution is one that is both subjectively genuine and objectively reasonable).  An alien seeking withholding of removal must meet a higher burden, proving he will more likely than not suffer future persecution on account of one of the enumerated protected grounds.  See Faye v. Holder, 580 F.3d 37, 41 (1st Cir. 2009); 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.16(b)(2); see also INS v. Stevic, 467 U.S. 407, 430 (1984).

In his brief, the petitioner characterizes his future persecution claim as follows: "[Mayorga-Vidal] does not claim that being targeted for recruitment efforts constitutes persecution, but that violent retribution for refusing to comply with those efforts does." Contending that he will be "branded an enemy," the petitioner argues that: "Insofar as his refusal to join constitutes an expression of an anti-gang political opinion, the Mara 18's retribution against him would clearly be political in nature. Insofar as his vulnerability to targeting, recruitment and attack is exacerbated by his status as a young man with no family to protect him, the retribution would be on account of his membership in a particular social group as well."

In its 2009 decision, the BIA held that Mayorga-Vidal had not established past persecution, and the petitioner does not challenge that conclusion. The Board also affirmed the denial of both the asylum and withholding of removal requests on the basis that Mayorga-Vidal had not established that any potential future persecution would be on account of his "proposed membership in a particular social group of those opposed to gangs, or any anti-gang 'political opinion' the gangs might impute to [him]."

## 1. Social Group

The term "particular social group," 8 U.S.C. § 1101(a)(42)(A), is not defined by statute, and we accord deference to the BIA's interpretation of the bounds of this phrase. See

Mendez-Barrera, 602 F.3d at 25-26; Faye, 580 F.3d at 41; see also Gonzales v. Thomas, 547 U.S. 183, 186-87 (2006) (per curiam). We have accepted that a legally cognizable social group is one whose members share a common, immutable characteristic that makes the group socially visible -- that is, generally recognizable in the community -- and sufficiently particular to define the group's membership. See Carvalho-Frois v. Holder, 667 F.3d 69, 73 (1st Cir. 2012); see also Faye, 580 F.3d at 41. Because discrete groups meeting the immutable characteristic requisite -- such as racial or ethnic groups, see 8 U.S.C. § 1101(a)(42)(A) -- are already independently afforded protected status, successful "stand-alone social group claims are rather rare," Silva v. Ashcroft, 394 F.3d 1, 5 (1st Cir. 2005).

The BIA has defined a common, immutable characteristic as "one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences," akin to the other four protected grounds -- race, religion, nationality, and political opinion. In re Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985); see Scatambuli, 558 F.3d at 59 (identifying factors relied upon by the BIA to determine whether a claimed social group constitutes a legally cognizable one). Examples include an innate characteristic such as sex, color, or kinship ties, or a shared past experience such as former military leadership or land ownership. In re

Acosta, 19 I. & N. Dec. at 233; see also In re C-A-, 23 I. & N. Dec. 951, 955, 959-60 (BIA 2006) (discussing immutability based on past experiences and collecting BIA cases illustrating a range of recognized "particular social groups").

Additionally, societal perceptions are important. The BIA has underscored that "the extent to which members of a society perceive those with the characteristic in question as members of a social group" plays a meaningful part in discerning whether a particular shared characteristic gives rise to a protected social group. In re E-A-G-, 24 I. & N. Dec. 591, 594 (BIA 2008); see Carvalho-Frois, 667 F.3d at 73 (providing that the common characteristic must be one that enables the community, not just the alleged persecutors, "readily to differentiate" members of the group from the country's populace as a whole).

Especially pertinent here, a common, immutable characteristic properly bounds a protected social group only if it is "sufficiently distinct" such that the proposed group would be recognized as a "discrete class of persons." In re S-E-G-, 24 I. & N. Dec. 579, 584 (BIA 2008). In other words, the proffered characteristic must provide a clear demarcation, "permit[ting] an accurate separation of members from non-members"; an amorphous feature will not satisfy this requirement. Ahmed v. Holder, 611 F.3d 90, 94 (1st Cir. 2010); In re S-E-G-, 24 I. & N. Dec. at 584. Consequently, loose descriptive phrases that are open-ended and

that invite subjective interpretation are not sufficiently particular to describe a protected social group. See Ahmed, 611 F.3d at 94; Mendez-Barrera, 602 F.3d at 27.

Discerning the parameters of a cognizable social group is not always a straightforward task, especially when the proposed shared immutable characteristic comprises a common life experience or circumstance, rather than an innate trait or physical demarcation. Nevertheless, an examination of precedent provides sufficient guidance in this case. See Garcia-Callejas v. Holder, 666 F.3d 828, 829 (1st Cir. 2012).

Mayorga-Vidal identifies his purported social group as "young Salvadoran men who have already resisted gang recruitment and whose parents are unavailable to protect them." We have, however, on many occasions rejected social group status for purported groups bearing similar hallmarks -- namely, youth who are resistant to gang membership. See id. at 830 (collecting cases that decline protected social group status for young Salvadoran men or women recruited by gang members or those who resist such recruitment); see, e.g., Diaz v. Holder, No. 11-1125, 2012 WL 372664, at *2 (1st Cir. Feb. 7, 2012); Socop v. Holder, 407 F. App'x 495, 498 (1st Cir. 2011); Mendez-Barrera, 602 F.3d at 26-27; Larios v. Holder, 608 F.3d 105, 109 (1st Cir. 2010). Recently, we displayed several BIA cases that are consistent with this approach. See Garcia-Callejas, 666 F.3d at 830.

-11-

The bulk of the characteristics of Mayorga-Vidal's purported social group -- young men who have resisted gang recruitment -- fall squarely within this governing authority, and the BIA cited to its own precedent in this regard when affirming the denial of asylum and withholding. See In re S-E-G-, 24 I. & N. Dec. at 585 (rejecting a petitioner's proposed social group of young Salvadorans who resisted gang recruitment in part because it represented a large, diffuse portion of society with characteristics simply too amorphous to readily distinguish the boundaries of membership). Although "particular social group" status is a country-specific inquiry that involves underlying fact finding, see Gonzales, 547 U.S. at 186-78; Faye, 580 F.3d at 41, we have repeatedly deferred to the BIA's reasonable determination that the features encompassing "youths who resist gang recruitment" are simply too subjective and open-ended to describe a sufficiently particular, legally cognizable social group. See, e.g., Diaz Ruano v. Holder, 420 F. App'x 19, 22 (1st Cir. 2011) (per curiam); Larios, 608 F.3d at 109; Mendez-Barrera, 602 F.3d at 27. The same analysis applies to this case, and we need not revisit it.

Mayorga-Vidal, however, seeks to distinguish his proposed group by attributing a purported immutable characteristic that he claims is sufficiently particular and socially visible: the group consists of those whose parents are unavailable to protect them. According to the petitioner, the BIA improperly relied on prior BIA

-12-

decisions and failed to consider the uncontroverted evidence that a large segment of Salvadoran children were left behind when their parents fled the country in the 1980s and 1990s due to civil war, that the young males who consequently lack parental protection are particularly vulnerable to gang recruitment, and that Salvadoran society, the police, and gangs all view this distinct, vulnerable population as prime candidates for gang recruitment. The record does not bear out these criticisms.

In affirming the IJ's dismissal of the claims based on social group, the BIA did not ignore the evidence, as the petitioner contends, but rather adopted the IJ's analysis and followed supportive BIA precedent. See In re S-E-G-, 24 I. & N. Dec. 579; In re E-A-G-, 24 I. & N. Dec. 591. The IJ's decision, in turn, reflects several reasons for declining to extend protected social group status to the proffered characteristics urged by the petitioner.

The IJ found that the petitioner's proffered group profile was "too broad and encompasses too large a percentage of the population." In so doing, the IJ followed prior BIA authority setting forth that "simply identify[ing] the common characteristic of a statistical grouping of a portion of the population at risk" is not enough to create a "particular social group." See In re Sanchez and Escobar, 19 I. & N. Dec. 276, 285 (BIA 1985). In considering the record before it, the IJ found that the evidence

-13-

did not establish that "young men without familial support are viewed as members of a distinct social group," and that the characteristics of "the claimed group do not define its members." This reasoning is supported by the record, is in keeping with governing authority, and displays a reasonable construction of the statutory category "particular social group."

By his own admission, Mayorga-Vidal's situation is "far from unique among Salvadoran children" in a country "swarming with unsupervised, uncared-for young people." Throughout his brief, he points to evidence that the familial-based vulnerability to gang-recruitment shared by many young Salvadoran males has a variety of causes, ranging from parents fleeing the country or dying during the civil war, to youth who are being raised by a single mother or are victims of domestic violence. He further identifies evidence that many youth are vulnerable to gang recruitment because they are not well-protected by the community at large. At bottom, the evidence supports the conclusion that the gangs are opportunistic and prey upon vulnerable youth without regard for the particular cause of weakness.

Not only does the determination of social group status require an appropriate evidentiary foundation, but also recognition of a statutorily-protected particular social group requires more than evidence of a broad social grouping based on a general immutable characteristic, even if the grouping bears some measure

-14-

of identifiable boundaries.  See, e.g., Civil v. I.N.S., 140 F.3d 52, 56 (1st Cir. 1998) (despite "ample documentary evidence that young people in Haiti were not exempted from the general violence and unrest that occurred in the aftermath of Haiti's military coup, [Haitian alien] presented no evidence that such persons constitute anything other than a general demographic segment of the troubled Haitian population").  This is just the type of evidentiary concern expressed by the IJ and adopted by the BIA in this case.  Moreover, for its part, the BIA also relied on In re E-A-G- in which it had previously rejected a Honduran citizen's request for social group status for "persons resistant to gang membership (refusing to join when recruited)," partly because the evidence failed to establish the existence and visibility of a persecuted group beyond a general showing of "statistical or actuarial groups," or "artificial group definitions."  24 I. & N. Dec. at 595.  Reliance on this precedent was sound.

The broad and diffuse nature of the petitioner's purported social grouping also stems from the loose and open-ended nature of the profile that he urges.  His label of youth "whose parents are unavailable to protect them" -- i.e., "lacking in parental protection" -- invites subjective interpretation.  Here, Mayorga-Vidal's parents left him in the care of his aunt and other family -- conduct which could be thought to afford him parental protection through the substitute care of other family members.

-15-

And yet, the aunt apparently neglected this expected task, leaving him unprotected and vulnerable to gang-recruitment. While some may view the loss of parental protection as due to his parents leaving the country, others might justifiably lay blame on the petitioner's aunt for failing in her substitute parental role. Leaving to one side the apparent assumption that Mayorga-Vidal's familial-based vulnerability would continue once he is back in his homeland, this one illustration drawn from the record demonstrates that a "lack of parental protection" inquiry involves too much subjectivity. It is not hard to paint the myriad difficulties that would be encountered in attempting to objectively distinguish between vulnerable youths lacking in supervision and those not. One wonders where and how the "lack of parental protection" boundary can be legitimately drawn based on objective criteria. In relying on In re S-E-G-, the BIA decision expresses a similar legitimate concern. See In re S-E-G-, 24 I. & N. Dec. at 585 (rejecting protected social group status to "Salvadoran youths who have resisted gang recruitment," reasoning in part that characteristics such as "male children who lack stable families and meaningful adult protection" are "amorphous because 'people's ideas of what those terms mean can vary'").[3]

---

[3]The petitioner challenges the IJ's conclusion that "[t]emporary placement for care with relatives does not equate into an immutable characteristic which is necessary to establish membership in a particular social group." He argues that this finding signifies a miscalculation about his group profile. We

Ultimately, the grouping advanced by the petitioner bears amorphous or boundless features not unlike those that we have previously rejected as giving rise to a legally cognizable "particular social group." See, e.g., Garcia-Callejas, 666 F.3d at 830 (noting that "[w]e have rejected social groups based solely on perceived wealth, even if signaling an increased vulnerability to crime"); Faye, 580 F.3d at 42 (declining the alien's requested social group status for "adulterers [having] a child out of wedlock" as "too general" and "not sufficiently particular" because it was too "difficult to identify" when the country's populace would consider a woman with her experience, i.e., having a child while married, as part of such a group).

The evidence does not compel a conclusion that there exists a particular social group comprised of young Salvadoran males who have resisted gang recruitment and are vulnerable to gangs from a lack of parental or family protection. The term "particular social group," while ambiguous, has an aim, just as do the other statutorily-protected categories such as race and religion. Not every shared characteristic -- including many common

---

disagree. The IJ's written decision reflects that when assessing the propriety of the social grouping advocated by Mayorga-Vidal, he considered what the petitioner classifies as his group's "critical" immutable characteristics: "his rejection of gang culture[,] his refusal to join it," and "[h]is status as a child, with absent parents." The "temporary placement" statement simply reflects the fact that the proffered social grouping partly rested on the petitioner's specific circumstance of having been temporarily placed under the care of other family members.

-17-

life experiences that cannot be undone -- will give rise to a cognizable social group.  See In re C-A-, 23 I. & N. Dec. at 958 (providing, "A past experience is, by its very nature, immutable, as it has already occurred and cannot be undone.  However, that does not mean that any past experience that may be shared by others suffices to define a particular social group for asylum purposes.").

The BIA's decision to decline to acknowledge protected status for Mayorga-Vidal's proposed group profile is substantially supported by the evidence and is a reasonable construction of the statute.  Accordingly, we accept it.  This holding is fatal to both the petitioner's "social group"-based requests for asylum and for withholding of removal.[4]

## 2. Political Opinion

Mayorga-Vidal next contends that the agency committed legal error when rejecting his claim of future persecution on account of his anti-gang, pro-establishment "political opinion." He argues that the IJ erred in dismissing his claim merely because

---

[4]In his reply brief, the petitioner argues for the first time that, in recent decisions, the BIA's "particular social group" analysis has departed from settled law by requiring members of a proposed social group to demonstrate not only that they share an immutable characteristic but also that the characteristic is "literally visible to the naked eye" and recognizable to the general population of the country from which they have fled.  This delayed argument is waived and we, therefore, decline to address it.  See Ouk v. Keisler, 505 F.3d 63, 66 n.3 (1st Cir. 2007) (issues raised by the appellant for the first time in the reply brief are generally deemed waived).

he was not a prominent gang critic or member of an organization aimed at dismantling or suppressing gangs, and that the IJ thereby failed to recognize that the petitioner had communicated his political opinion to the gang members by refusing their efforts to recruit him.  Challenging the BIA's decision, the petitioner charges that it "engaged in no analysis whatsoever," and simply followed its precedent without accounting for the "fundamentally different" evidence before it.  These plaints lack merit.

The IJ found that the gang members' recruitment efforts did not arise "out of a political animus," and also underscored two evidentiary points:  first, while the petitioner testified to his firmly held anti-gang opinion, he presented no evidence that he expressed this opinion to the gang members during his encounters with them; and second, he presented no evidence that he had made his anti-gang opinion publicly known.  We discern no error in this reasoning.

Political persecution may be grounded on an imputed political opinion, whether or not the opinion is correctly or incorrectly attributed to the alien.  See Vasquez v. I.N.S., 177 F.3d 62, 65 (1st Cir. 1999).  Nevertheless, evidence of mere refusal to join a gang, without more, does not compel a conclusion that the alleged persecutor viewed the alien's resistance as an expression of a political opinion.  See In re E-A-G-, 24 I & N. Dec. at 596; see also INS v. Elias-Zacarias, 502 U.S. 478, 481-82

-19-

(1992) (rejecting notion that an alien's mere resistance to forced guerilla conscription necessarily expresses a political opinion hostile to the alleged persecutor). Here, the petitioner points to no evidence compelling a conclusion that the gang members understood that his mere refusal to join their ranks was an expression of an anti-gang, pro-establishment political opinion. See Vasquez, 177 F.3d at 65. Indeed, the evidence supports the IJ's finding that the gang's recruitment agenda was simply strategic rather than political. See id.; see also Tobon-Marin v. Mukasey, 512 F.3d 28, 31 (1st Cir. 2008) (identifying range of motives that may drive coercive conscription efforts); cf. Reyes Beteta v. Holder, 406 F. App'x. 496, 499 (1st Cir. 2011) (collecting cases holding that gang action motivated by extortion is not equivalent to targeting a protected social group).

Finally, contrary to the petitioner's assertion, the BIA adopted the analysis of the IJ, and the Board properly viewed two of its prior decisions as materially indistinguishable from Mayorga-Vidal's case. See In re S-E-G-, 24 I. & N. Dec. 579; In re E-A-G-, 24 I. & N. Dec. 591. Both prior BIA decisions dismissed claims of political opinion persecution partly because the record lacked evidence showing that the gangs would impute an anti-gang political opinion to the alien's actions in refusing to join their ranks, or showing that the gangs were motivated by any reason other than increasing their size and influence. In re S-E-G-, 24 I. &

N. Dec. at 589; In re E-A-G-, 24 I. & N. Dec. at 597.  The BIA's reliance on these decisions was sound.

In the end, we discern no error in the agency's finding that the petitioner failed to establish a well-founded fear of future persecution on account of his political opinion.[5]  This holding also dooms his request for withholding of removal.

## Convention Against Torture

To prevail on a CAT claim, an applicant must prove that he will more likely than not face torture upon repatriation.  See Ahmed, 611 F.3d at 97-98; see also 8 C.F.R. §§ 1208.16(c)(2).  Torture involves "any act by which severe pain or suffering, whether physical or mental . . . is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  8 C.F.R. § 1208.18(a)(1); see Limani v. Mukasey, 538 F.3d 25, 32 (1st Cir. 2008).  It is "an extreme form of cruel and inhuman treatment and does not include lesser forms of

---

[5]The 2004 IJ decision also found there was no nexus between the petitioner's encounters with gang members and his purported membership in a "social group" based on his lack of parental or family support.  The IJ specifically found that the gang members' conduct "can be attributed to other factors beyond [Mayorga-Vidal's] identification with this particular group," and that the gang "threats are more closely linked with the gang's desire to outnumber its rival gang as opposed to persecuting [Mayorga-Vidal] for membership in a particular social group."  This lack of nexus finding was endorsed by the BIA in its 2009 decision and provides additional support for the agency's dismissal of the petitioner's "social group"-based claim of future persecution.

-21-

cruel, inhuman or degrading treatment or punishment that do not amount to torture."  8 C.F.R. § 1208.18(a)(2); see also 8 C.F.R. § 1208.18(a)(4)-(6).

Mayorga-Vidal argues that the IJ erroneously rejected his CAT claim on the sole basis that he failed to prove that the Salvadoran government had actual knowledge of his specific encounters with the gangs and of the specific future torture that he fears will take place.  According to the petitioner, the IJ's decision is flawed because government acquiescence only requires proof that "government officials deliberately accept the group's activities" such that the gangs may be considered "state actors."[6] But see 8 C.F.R. § 1208.18(a)(7) ("Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity.").  Regardless, the petitioner reads the IJ's reasoning too narrowly.  Properly read, the agency decision is supported by the evidence and legally sound.

---

[6]The petitioner cites to the BIA decision of In re S-V-, 22 I. & N. Dec. 1306 (BIA 2000), to support his view of the legal contours for government acquiescence.  This reliance is surprising given the disdainful treatment of this BIA decision by several circuits.  See, e.g., Hakim v. Holder, 628 F.3d 151, 155-56 (5th Cir. 2010); Marroquin-Ochoma v. Holder, 574 F.3d 574, 579 n.3 (8th Cir. 2009); McIntosh v. I.N.S., 247 F. App'x 226, 227-28 (2d Cir. 2007); Silva-Rengifo v. Att'y Gen., 473 F.3d 58, 65-70 (3d Cir. 2007); Amir v. Gonzales, 467 F.3d 921, 927 (6th Cir. 2006); Zheng v. Ashcroft, 332 F.3d 1186, 1196 (9th Cir. 2003).

The IJ determined that the petitioner failed to establish the government acquiesced to the gang's threatening conduct toward him in the past, or that it would do so in the future. Specifically addressing Mayorga-Vidal's past gang encounters, the IJ noted that he "did not report the threats to the police or any other governmental agency." This observation supports the conclusion that the Salvadoran government lacked actual knowledge of the gang's specific conduct toward Mayorga-Vidal. Coupled with other evidence reviewed by the IJ, it also supports the conclusion that the petitioner failed to show that the government would acquiesce to torture by gangs.

The IJ considered evidence that the government has been taking concrete measures to combat gang violence. The record shows that the government established an anti-gang task force, deploying military personnel to high crime areas, and also that the authorities arrested many individuals pursuant to anti-gang legislation. Although there was evidence some police officers have engaged in gang-related activity, the record also supports the conclusion that such individuals were arrested for their actions, expelled from the police force, or otherwise held responsible for their misconduct.

El Salvador's efforts at managing gang activity have not been completely effectual. The record, however, does not compel a conclusion that the government has acquiesced in gang activities.

<u>Cf</u>. <u>Mendez-Barrera</u>, 602 F.3d at 28 (holding that country conditions reports, standing alone, failed to establish that the petitioner would face a likelihood of government-sanctioned torture); <u>Faye</u>, 580 F.3d at 42 (affirming the agency's dismissal of a CAT claim where the alien failed to report the domestic abuse to the authorities or to otherwise display a sufficient link to the government); <u>Amilcar-Orellana</u> v. <u>Mukasey</u>, 551 F.3d 86, 92 (1st Cir. 2008) (affirming the agency's dismissal of a Salvadoran alien's CAT claim because substantial evidence supported the BIA's conclusion that the government "is trying as best it can to control the gangs"). Accordingly, we must accept the BIA's determination that the petitioner has not established a likelihood of torture if he is repatriated.

### III. Conclusion

After careful review of the record and the agency decisions, we **<u>deny</u>** the petition.