# United States Court of Appeals

## For the First Circuit

No. 04-1541
No. 04-2185

ABDELHAFID ZAROUITE,

Petitioner

v.

ALBERTO GONZALES, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, Chief Judge,

Cyr, Senior Circuit Judge,

and Howard, Circuit Judge.

Jeremiah Friedman with whom Ilana Greenstein, Harvey Kaplan, Maureen O'Sullivan and Kaplan, O'Sullivan & Friedman, LLP were on brief for petitioner.

Joanne E. Johnson, Office of Immigration Litigation, Civil Division, Department of Justice, with whom Peter D. Keisler, Assistant Attorney General, Civil Division, and Papu Sandhu, Senior Litigation Counsel, were on brief for respondent.

September 16, 2005

**BOUDIN**, **Chief Judge**.  Abdelhafid Zarouite, a citizen of Morocco, entered the United States without proper documentation in June 2000.  Removal proceedings began against him in the same month, 8 U.S.C. §§ 1182(a)(6)(A)(i), (a)(7)(A)(i) (2000), during which he conceded removability but sought asylum on grounds of persecution.  8 U.S.C. § 1158(b)(1) (2000); 8 C.F.R. § 208.13(b) (2005).  The pertinent background events, and the allegations made by Zarouite, are as follows.

Zarouite was born and raised in Casablanca, Morocco, attended university there, and lived in the city until 1996.  In that year--according to Zarouite--he and his parents were forced by the Moroccan government to move to the territory of Western Sahara.  Morocco currently occupies much of the area; the remaining parts of the territory are apparently controlled by an independence movement, the Polisario Front.  In the 1990s Morocco and the Polisario Front negotiated, under United Nations auspices, a possible referendum to determine the territory's status.

A dispute existed as to whether all residents would be permitted to vote in the referendum, or only those (mainly ethnic Sahrawis) who resided in Western Sahara prior to 1975.  Zarouite claimed that he and his parents, of Sahrawi descent, were compelled to move to Western Sahara in 1996 because the Moroccan government wanted more votes against independence.  Zarouite contends that for three years after his arrival in Western Sahara, he suffered

-2-

beatings and attacks at the hands of the Polisario Front, which wanted him to leave.

In 1999, Zarouite returned to Casablanca where he said he was imprisoned by the Moroccan government and given the choice between returning to Western Sahara or remaining in jail. After several months he returned to Western Sahara where, he says, he again suffered harassment from the Polisario Front. In June 2000 he left, entered the United States unlawfully through Canada, and was apprehended by American authorities.

After a hearing, the immigration judge denied the request for asylum and withholding of removal on the express ground that he did not credit Zarouite's testimony as to persecution, many aspects of which he found improbable. Some of the immigration judge's reasoning raises eyebrows (he thought it improbable that the government would remove a gainfully employed family from Casablanca); other doubts might seem better founded (the judge thought that Zarouite's account of one of the alleged assaults involved an improbable escape from harm).

Zarouite then sought review by the Board of Immigration Appeals ("BIA"), which on April 1, 2004, issued a two-paragraph affirmance. The BIA said that the immigration judge did not give "specific and cogent reasons" for his credibility finding, that the BIA therefore "assume[d]" Zarouite's credibility, but that "even if" the alleged acts constituted past persecution, "the record ...

reveals fundamental changes in Morocco since [Zarouite's] departure such that his fear of returning is no longer well-founded."

For this last proposition, the BIA cited only a State Department "country report" on Morocco dated March 4, 2002. The BIA summarized the report by saying that it showed that, despite some past abuses, today "the Moroccan government generally respects the rights of its citizens and that Sahrawis who have departed to Morocco are encouraged to return provided they recognize Morocco's sovereignty over the Western Sahara." This was the sole support offered to show that Zarouite's assumed fear was unfounded.

Although we are aware of the BIA's very large volume of cases and the difficulties it faces with self-serving stories, the BIA decision in this case cannot be sustained. The question in this case is relatively narrow. The BIA concluded that Zarouite was not eligible for asylum--whether the Attorney General wishes to grant it is a separate matter, Ravindran v. INS, 976 F.2d 754, 758 (1st Cir. 1992)--and Zarouite is entitled to judicial review on the eligibility question. Id. The legal framework as to eligibility is well settled.

Under the statute and case law, Zarouite had to establish a well-founded fear of future persecution on one or more of five enumerated grounds (race, religion, nationality, membership in a particular social group, and political opinion). 8 U.S.C. § 1101(a)(42)(A). Ordinarily, the persecution has to involve

-4-

government actors, although government action exposing him to persecution by others or refusing to protect him against such persecution could suffice. See Harutyunyan v. Gonzales, --- F.3d ---, No. 04-2207, slip op. at 9 (1st Cir. Sept. 2, 2005).[1] One basis for showing such a well-founded fear (the one pressed by Zarouite) is to show past persecution, which gives rise to a presumption of future persecution which is sufficient for the applicant's case unless rebutted by the Attorney General (e.g., by showing changed conditions). 8 C.F.R. § 208.13(b); Fergiste v. INS, 138 F.3d 14, 18 (1st Cir. 1998).

Zarouite's argument in this court for such a showing of past persecution appears to proceed as follows: the Moroccan government deported him to Western Sahara because of his ethnic heritage as a Sahrawi (arguably satisfying the "social group" criterion of the statute); the deportation has exposed him to repeated physical assault and risk of death by the Polisario Front; the Moroccan government has been unwilling or unable to protect him; and the combined effect is that he is being threatened with beatings or worse as a result of action and inaction by the Moroccan government.

---

[1]Zarouite's brief claims persecution by both the government and the Polisario Front but we need not consider whether the latter's actions standing alone would satisfy Harutyunyan; if the government did not compel Zarouite to remain in the contested area, any threat to him from the Front would seemingly disappear.

In its decision, the BIA was content to assume past persecution arguendo and to dispose of the case on a quite different ground, namely, the inference it drew from the country report that "even if" Zarouite had been persecuted in the past, the Moroccan government had changed its ways and no fear of repetition could be well founded. The State Department's regular country reports are generally persuasive of country conditions, 3 Gordon, Mailman & Yale-Loehr, Immigration Law and Procedure § 33.04[3][f] (2005), but are open to contradiction. Gailius v. INS, 147 F.3d 34, 45 (1st Cir. 1998).

In this case, says the Attorney General, the substantial evidence standard applies and the BIA's decision should be upheld unless the record "compels" the opposite result. Compare Aguilar-Solis v. INS, 168 F.3d 565, 569 (1st Cir. 1999). Admittedly, the record does not "compel" the conclusion that the Moroccan government will repeat the alleged behavior that Zarouite attributes to it, but the problem here is that the country report does not directly address such behavior at all, so the rationality of the inference is open to question.

The most pertinent sentences in the report are as follows:

> The Government also encouraged the return of Sahrawis who have departed Morocco due to the conflict in the Western Sahara, provided that they recognize the Government's claim to the region. The Government did not permit Western

> Saharan nationalists who have been released
> from prison to live in the disputed territory.

Zarouite's testimony, if believed, suggests that the Moroccan government once had a policy of requiring some Moroccans to move to Western Sahara in order to bolster a vote in Morocco's favor in an anticipated referendum. It would hardly make sense for the Moroccan government to make one family alone move back. If Morocco once had such a policy, abandonment of the policy would defeat the basis for Zarouite's claim. But the quoted language from the country report neither concedes such a policy nor suggests that, if it once existed, it has now been discontinued. See Fergiste, 138 F.3d at 19.

The BIA paraphrased the report in another, far more general, respect. It said that the Moroccan government generally respects the rights of its citizens. Inferences can be drawn from the general to the particular; conceivably, a country report could reflect such a firm present adherence by a government to high human-rights standards, across a range of activities, that forced relocation of population for political purposes would be implausible and defeat any well-founded fear of repetition of past abuses.

It is enough to say in summary that the country report says that the human rights record in Morocco, once discouraging, is now improving, but this is far from the kind of blanket endorsement just posited. Indeed, a pertinent excerpt from the report reads:

"The Government generally respected the rights of citizens in most areas; however, the Government's record was generally poor in a few areas." Thus, it is difficult to understand why the BIA thinks that the country report makes Zarouite's assumed fear of future repetition unreasonable.

Notably, the government's brief makes no developed argument to show that the report rebuts Zarouite's fear of future persecution; it merely asserts this proposition in conclusory terms and passes on with suspicious swiftness. Here is the gist of the discussion, stripped of citations to the proposition that country reports can be invoked:

> Petitioner also weakly challenges the Board's well-founded fear finding, by claiming that the 2001 Country Report, upon which the Board relied, was insufficient. Pet. Br. at 25. However, the 2001 Country Report, which demonstrated changed country conditions in Morocco and disproved Petitioner's well-founded fear of future persecution, substantially supports the Board's determination. . . . [As in another cited case,] Petitioner failed to present "powerful evidence" to discount the 2001 Country Report and prove that his fear of future persecution is well-founded.

Nothing in the brief shows that the country report "disproves" Zarouite's fear, nor does the report itself do so when read in full. Thus there was no need for Zarouite to "discount" the country report since it does not contradict the thrust of his testimony. The inference that the BIA seeks to draw from the report is not rational, or if it could be rationally explained, the

government has failed to do so. See Ren v. Ashcroft, No. 04-1702, 2005 WL 1950805, at *4 (1st Cir. Aug. 16, 2005).

Two further matters remain to be noted. First, Zarouite also claims that the BIA failed to consider the possibility that--regardless of future persecution--it would be inhumane to return him to Morocco because his past treatment had been so terrible. Such an exception exists for extraordinary suffering, Tokarska v. INS, 978 F.2d 1, 1-2 (1st Cir. 1992), but it seems quite unlikely that Zarouite could qualify and, decisively, he has forfeited any such claim by failing to raise it at the agency level. Makhoul v. Ashcroft, 387 F.3d 75, 80 (1st Cir. 2004).

Second, in an effort to undo the BIA's initial decision, Zarouite filed a motion to reopen on June 25, 2004, attaching more recent country reports on Morocco and other related documents. On August 12, 2004, the BIA denied the motion on the ground that the new information did not show a significant change in country conditions from the report relied on by the BIA and that Zarouite did not "meet his heavy burden of demonstrating that if the proceedings were reopened, the evidence would likely change the result in this case."

Zarouite has sought review of this denial. His position is that these materials show a relapse as to human rights on the part of the Moroccan government, including political repression and abuses such as torture. Interestingly, the more recent reports are

-9-

mixed as to government policy toward Western Sahara. Some information suggests that Morocco is interested in populating Western Sahara with supporters; other information indicates that it may no longer be interested in a referendum at all.

In any event, the original report relied upon by the BIA does not adequately support the BIA's inference so Zarouite's effort to contradict it with later reports is at present beside the point. If on remand the agency continues to assume arguendo that Zarouite's story is true and to resolve the case based on current country conditions, it will have to update the record and provide a reasoned explanation. Alternatively, it may choose to follow some other course that will make country conditions irrelevant.

The BIA order of April 1, 2004, is vacated and the matter remanded for further appropriate proceedings. So far as the petition seeks review of the refusal to reopen, it is dismissed as moot.

It is so ordered.