# United States Court of Appeals
## For the First Circuit

No. 05-1100

STEPHEN WAWERU,

Petitioner,

v.

ALBERTO GONZALES, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, <u>Chief Judge</u>,

Selya, <u>Circuit Judge</u>,

and Stahl, <u>Senior Circuit Judge</u>.

<u>Ilana Etkin Greenstein</u>, <u>Harvey Kaplan</u>, <u>Maureen O'Sullivan</u>, <u>Jeremiah Friedman</u> and <u>Kaplan, O'Sullivan & Friedman, LLP</u> on brief for petitioner.
<u>Thomas P. Colantuono</u>, <u>United States Attorney</u>, and <u>Aixa Maldonado-Quiñones</u>, Assistant United States Attorney, on brief for respondent.

February 13, 2006

**BOUDIN, <u>Chief Judge</u>.** Stephen Waweru, a Kenyan national born in 1972, immigrated to the United States on a valid student visa in September 1992. He applied for asylum in November 1993 and was placed into deportation proceedings in December 1996. Waweru conceded deportability but sought asylum and withholding of removal on the grounds that he had previously suffered persecution in Kenya because of his political beliefs and reasonably feared future persecution should he return. <u>See</u> 8 C.F.R. § 208.13 (2005).

For reasons not fully explained, the proceedings dragged on through a series of hearings from 1997 to 2000, followed by another delay in 2002 for Waweru to obtain new counsel. For the final hearing, held in September 2003, a new immigration judge replaced the original immigration judge who had presided at the earlier proceedings.

After Kenya gained its independence in December 1963, a <u>de facto</u> (and later <u>de jure</u>) one-party state was established under the first president, Jomo Kenyatta, and continued under his successor, Daniel arap Moi. After a change to the constitution in 1991, multi-party elections were held in 1992 and 1997, but Moi won reelection both times and his party, the Kenya African National Union ("KANU"), remained dominant. Waweru testified that his mother was active in an opposition party, the Forum for the Restoration of Democracy ("FORD"), and convinced him to join in 1988.

Waweru testified that after he began to take an active part in FORD, he was subjected to threats, intimidation and--in 1991 and 1992--multiple arrests and beatings because of his opposition to Moi. Waweru says that his mother was also accosted and beaten by police and by youth gangs loyal to the KANU party. After Waweru's last arrest in May 1992, he secured a U.S. student visa and left the country for the United States in September. That same year FORD split into two factions: FORD-Kenya and FORD-Asili (to which Waweru and his family adhered).

In October 2001, Moi said he would not run again (his term was scheduled to end in 2003) and thereafter a number of opposition parties formed an alliance, the National Rainbow Coalition ("NARC"), to challenge KANU and its candidate for president. The alliance included, according to Waweru, the FORD-Kenya party and a break-away faction of KANU. In December 2002, the NARC's candidate defeated Moi's designated successor and the new regime took over the government. Waweru's final hearing, in September 2003, understandably focused upon the recent political changes in Kenya, acknowledged in the U.S. State Department's country report.[1]

---

[1]The Board of Immigration Appeals is entitled to rely on the State Department's country reports as proof of country conditions described therein, although it must also consider evidence in the record that contradicts the State Department's descriptions and conclusions. See, e.g., Zarouite v. Gonzales, 424 F.3d 60, 63-64 (1st Cir. 2005).

At the hearing the immigration judge ("IJ") asked Waweru why, "[c]onsidering that Moi is no longer in power, the KANU party is no longer in power," he "would . . . be afraid to go back to Kenya now?"  Waweru responded:

> One reason is because as--since there was a new president, I've spoken--you know, called people back home. . . . I've spoken to them about . . . is there any changes now that we have a new president?  They say that he's been--according to what he's telling people, he's out for good.  He is out to bring change, but the things that--you know, that were happening before is still happening.  People are getting killed.  People are getting killed for no reason.

When pressed by the IJ as to why the <u>new</u> government of Kenya would want to harm him, Waweru responded that he "believe[s] there are members of the police and the security called KANU youth-wingers who are still there now," and they knew he left and would want to hurt him again.  He explained that this was so because he

> would be active . . . in the politics again. . . . I would get into their hands whatever part of the country I would be in, and if something came to be known--well, one reason would be that if I got arrested, it would be for the reasons of being against the government.[2]

Thereafter the IJ ruled that Waweru had adequately shown past persecution based on his political opinions, which gives rise

---

[2]The IJ asked Waweru why he would remain in opposition "if . . . the opposition took power."  Waweru responded that he was "always going to be on the side of human rights and the proper government, democracy, and funds going to where they're supposed to be going, schools and all that, and not being used by leaders."

-4-

to a presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). Such a presumption, unless rebutted, establishes eligibility for asylum, 8 U.S.C. § 1101(a)(42)(A) (2000); but rebuttal may be based on a showing that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in [his] country of nationality." 8 C.F.R. § 208.13(b)(1)(i)(A).

In this instance, the IJ found that "the prior basis of [Waweru's] claim was the government of President Moi which is no longer in power. The Court simply finds that [Waweru] no longer has a well-founded fear of persecution on account of his political opinion . . . ." The IJ also found that Waweru did not qualify for humanitarian asylum, 8 C.F.R. § 208.13(b)(1)(iii)(A), for withholding of removal under former section 143(h) of the Immigration and Nationality Act ("INA"),[3] or for withholding of removal under the United Nations Convention Against Torture. See Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-821; see also 8 C.F.R. § 208.16(c).

---

[3]INA section 143(h), formerly codified at 8 U.S.C. § 1253(h), was repealed by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, § 307, 110 Stat. 3009, 3009-613 to 3009-614, but under IIRIRA transitional rules, its repeal does not apply to proceedings (such as Waweru's) begun before IIRIRA's April 1, 1997, effective date. Id. § 309(c), 110 Stat. 3009, 3009-625 to 3009-626.

Waweru appealed to the Board of Immigration Appeals ("BIA"), arguing inter alia that the IJ's decision failed to link changed conditions in Kenya to his situation. The BIA summarily affirmed based on the IJ's decision and, accordingly, it is the IJ's decision that we review. Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003). We review findings of fact "under a deferential 'substantial evidence standard,'" Alvarez-Flores v. INS, 909 F.2d 1, 3 (1st Cir. 1990), and defer to the BIA's (or, here, the IJ's) reasonable inferences in evaluating evidence, Martinez v. INS, 970 F.2d 973, 975 (1st Cir. 1992).

The main issue in this case is simply stated but less easily resolved: it is whether the IJ rationally concluded that the government, relying on evidence of changed country conditions, had rebutted the presumption that Waweru retained a "well-founded" fear of future persecution. Cases turning on changed country conditions are not uncommon, and the cases contain a certain amount of pertinent general language;[4] but very little of it helps decide concrete cases like this one which tend to turn on reasoning about specific facts.

Some of our decisions suggest that changed country conditions cannot suffice without a more particularized showing,

---

[4]See, e.g., Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 24-25 (1st Cir. 2004); Quevedo v. Ashcroft, 336 F.3d 39, 44-45 (1st Cir. 2003); Yatskin v. INS, 255 F.3d 5, 10 (1st Cir. 2001); Fergiste v. INS, 138 F.3d 14, 19-20 (1st Cir. 1998).

see, e.g., Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 24-25 (1st Cir. 2005), and some suggest the contrary, see, e.g., Quevedo v. Ashcroft, 336 F.3d 39, 44 (1st Cir. 2003); but the reconciling (and most accurate) proposition is that changed country conditions "do not automatically trump" the applicant's specific evidence. Fergiste v. INS, 138 F.3d 14, 19 (1st Cir. 1998) (emphasis added); see also Palma-Mazariegos v. Gonzales, 428 F.3d 30, 36 (1st Cir. 2005). The surrender of the British at Yorktown in 1781 did not negate the potential threat to Tories; it probably did as to the Patriots.

Here, one might think it plain that Waweru's fear of persecution at the hands of the Moi regime, on account of his political opposition to it, would cease to be reasonable once Moi had been defeated and replaced by a democratic government. But Waweru offers three counters: that some of Moi's own former followers are part of the successful anti-Moi coalition; that many lower level functionaries (e.g., individual policemen) are still in their original roles and behaving brutally; and that he (Waweru) will oppose this government, too.

The question, then, is whether the IJ rationally found such arguments unpersuasive in concluding that the change of regime did overcome Waweru's once well-founded fear. True, the IJ did not separate the strands and discuss them individually; but it is enough if we can perceive from the evidence and the arguments how

his mind would naturally have run.  See Rodriguez-Rodriguez v. Ortiz-Velez, 391 F.3d 36, 40 (1st Cir. 2004); Tang v. State of R.I., Dep't of Elderly Affairs, 120 F.3d 325, 326 (1st Cir. 1997). In this case, it is easy enough to discern the line of reasoning.

The victorious anti-Moi coalition plainly included former Moi followers.  One of its components is a break-away faction of KANU itself.  But the coalition opposed and defeated Moi's hand-picked successor supported by the main KANU party. The IJ could reasonably reject, as weak and unsupported, an inference that the present government is dominated or heavily influenced by those whom Waweru once opposed.  In addition, news reports relied on by the government (and submitted to the IJ by Waweru prior to his final hearing below) suggest that the new regime is genuinely opposed to Moi's style of governance--as does Waweru's own testimony at his final hearing.

The second argument in Waweru's favor is somewhat stronger.  It is possible, perhaps likely, that many of those who served in the police in the Moi years are still in their accustomed roles.  It is also quite plausible, as Waweru specifically claimed in the final hearing, that police brutality and corruption remain high; it takes a long time to alter attitudes ingrained over a period of despotism, especially in circumstances of poverty that afflict much of the world.  Waweru, like others in his country, doubtless faces very real risks.

Lacking, however, is any reason to think that Waweru is at risk--even from these same officers who earlier arrested and beat him--because of Waweru's opposition to the Moi regime. Even if certain officers still prefer Moi's one-party state, their central motive for hostility to Waweru was his active opposition to the Moi government. That government is gone; so, one would think, is the motive. The IJ was not rationally obliged to accept Waweru's inference that the threat of political persecution continued.

This brings us finally to Waweru's claim that he would oppose the new government. We will assume arquendo that Waweru could make out a claim of persecution even if he chose deliberately to put himself in harm's way; sometimes this view might be justified, sometimes not. Nor is his position necessarily captious or unworthy of being credited: we take it from context that he may regard the new government, even if better motivated than Moi's, as one that still falls far short of Waweru's expectations.

Still, the new government took power by beating Moi at the polls; according to the news reports, it professes democratic ideals and promises reforms. The notion that it would treat Waweru's renewed peaceful opposition with the repressive brutality of the Moi regime is not compelling, or at least not an inference so strong that the IJ had to accept it. See Yatskin v. INS, 255 F.3d 5, 10 (1st Cir. 2001); see also In re N-M-A-, 22 I. & N. Dec.

312, 320-21 (B.I.A. 1998) (asylum applicant persecuted by prior regime cannot retain presumption of well-founded fear of future persecution after regime change unless the new leaders "harbor the same animosities as the old").

As for Waweru's other claims of error, the first sought reversal of the BIA's rejection of his request for withholding of removal under the INA. A request for asylum and a request for withholding of removal require petitioners to meet different evidentiary burdens: withholding of removal requires a petitioner to prove "a clear probability of persecution" upon removal to the country in question, as contrasted with the less burdensome "well-founded fear of persecution" requirement for asylum eligibility. Aquilar-Solis v. INS, 168 F.3d 565, 569 n.3 (1st Cir. 1999).

But whereas proof of a well-founded fear of persecution merely earns a petitioner eligibility for asylum, leaving the ultimate decision to the Attorney General's discretion, Romilus v. Ashcroft, 385 F.3d 1, 6 (1st Cir. 2004), a petitioner who meets the requirements for the (since-repealed) withholding of removal provision of the INA generally cannot (with very few exceptions) be removed to the country at issue. INS v. Aquirre-Aquirre, 526 U.S. 415, 419 (1999); Romilus, 385 F.3d at 8. In any event, since we uphold in this case the IJ's ruling that Waweru has not established a well-founded fear of future persecution in Kenya, he certainly

-10-

cannot show a "clear probability of persecution" if he is returned to Kenya. See id.; Hernandez-Barrera, 373 F.3d at 26 n.14.

Waweru also sought protection under the U.N. Convention Against Torture. Under the Convention, a showing that a petitioner, if deported, will "more likely than not" be tortured by or with the consent or acquiescence of a public official gives a petitioner mandatory protection from removal to the country in question. Elien v. Ashcroft, 364 F.3d 392, 398 (1st Cir. 2004) (citing 8 C.F.R. § 208.16(c)(2); In re J-E-, 23 I. & N. Dec. 291, 297 (BIA 2002)). The petitioner need not prove that the probable torture will be motivated by one of the limited classes of reasons applicable to asylum and withholding of removal claims.

In this case, even if we were to assume that Waweru's earlier beatings by the police amounted to torture under the Convention's definition--a proposition that is far from clear--we cannot say that the IJ's decision lacked "substantial evidence" to support it. Alvarez-Flores, 909 F.2d 3. As we stated above, the IJ was not compelled on the evidence submitted to accept the inference that Waweru would be targeted for persecution (torture or otherwise) upon return, since the only apparent motive for such persecution (at the hands of police or the Moi government) no longer exists.

Finally, the IJ did not abuse his discretion in rejecting Waweru's request for humanitarian asylum; this is granted only in

-11-

cases of "extraordinary suffering," Zarouite v. Gonzales, 424 F.3d 60, 64 (1st Cir. 2005), and the arbitrary arrests and beatings alleged by Waweru do not rise to this level.

The petition for review is denied.