LYNCH, Chief Judge.
Selvin Asael Mejilla-Romero, then age eleven, entered the United States illegally and without inspection near Brownsville, Texas, on July 24, 2002. He is now eighteen years old. He petitions for review of a final order of the Board of Immigration Appeals (BIA) denying his application for asylum, -withholding of removal, and protection under the Convention Against Torture (CAT).
The BIA and the Immigration Judge (IJ) rejected the claims on a number of independently sufficient grounds. They rejected his past persecution claims, which asserted that when he lived with his grandmother as a child in Honduras the mistreatment he suffered at the hands of two antagonists — a neighbor and a street gang — amounted to “persecution.” They found in addition that he had failed to show the mistreatment was “on account of’ any of the five protected grounds and failed to show the requisite connection to government action or inaction existed. Thus, he had not met the past-persecution prong.
The BIA and IJ also rejected MejillaRomero’s assertions that he will suffer future persecution if returned to Honduras on account of his resistance to gang membership, an ongoing feud with his grandmother’s neighbor’s family, and the possibility that he may be homeless, although he has some family there. They also both found that he had failed to establish eligibility for withholding of removal or relief under the CAT. Both the BIA and IJ considered all the evidence of record, as have we, and we cannot say the record compels us to reach different conclusions as to the legal requirements for asylum, withholding of removal, and CAT relief. We deny Mejilla-Romero’s petition.
I.
As a child, Mejilla-Romero lived with his grandmother in the small Honduran town of Arimis. While Mejilla-Romero was growing up, he had a series of bad encounters with a neighbor named “Hubert.” Hubert called Mejilla-Romero’s family “[cjommunists” and said, as an attack on the family, that they were “[p]eople that are dying, that are starving.” Hubert also threw stones at Mejilla-Romero and once threw a machete that hit petitioner’s leg, leaving a visible scar. On another occasion, Hubert attacked Mejilla-Romero’s grandmother’s home with a machete, and he once destroyed the garden. Mejilla-Romero claims the shock from the at *66 tack on the garden sent his ailing aunt to the hospital, where she ultimately died.
Mejilla-Romero also had great difficulties with a gang of young males, aged fifteen and older, who came to Arimis from another town. On several occasions, the gang waited for Mejilla-Romero outside of school and attempted to steal his money. The gang members pushed him and once threw him from a small house, leaving him entangled in wire. He was disentangled by a man he called his “uncle,” who may not have been a blood relative. In a July 2005 affidavit, Mejilla-Romero stated that these “older boys” also threw snakes at him several times and that he “feared that they wanted to sexually target” him; he offered no further details and did not describe these incidents in his testimony before the IJ. Mejilla-Romero believes that all of these incidents were motivated by the gang members’ wanting to recruit him into their gang. Mejilla-Romero concedes that neither he nor his family ever contacted the police or other authorities about any of these incidents.
Additionally, one of Mejilla-Romero’s uncles was killed in 1996, when MejillaRomero was five years old. A Honduran court issued an arrest warrant shortly after his death, stating that his killer had been indicted “for the crime of assassination” and calling for his arrest “as expeditiously as possible.” A copy of this warrant was in evidence before the IJ. Although Mejilla-Romero does not recall the circumstances of his murder, no evidence compelled the conclusion that there was any connection between petitioner’s mistreatment and his uncle’s death.
Mejilla-Romero is now eighteen years old, having spent the seven years since his illegal entry in the Boston area with his mother. While in this country, MejillaRomero and his family have also been victims of traumatizing violence, discussed both in his own testimony and in statements he made to a psychologist whom he saw in support of his asylum application. That report was in evidence and was referred to by the IJ in his decision.
While in the United States, MejillaRomero also met again with his father, who later returned to Honduras. Though his father, grandmother, and members of his grandmother’s family currently reside in Honduras, he fears that he will be homeless if he returns.
Federal authorities served MejillaRomero with Notice to Appear the day after he entered this country. There were proceedings and hearings spread out over a number of years as Mejilla-Romero made efforts to achieve legal status. In October 2004, after it had been determined that he was ineligible for Temporary Protected Status, Mejilla-Romero filed an application for asylum, withholding of removal, and CAT relief.
In hearings before an IJ between July 2005 and November 2006, Mejilla-Romero testified in support of his application for relief. He was then between thirteen and fourteen years old. The IJ also reviewed documentary evidence and heard testimony from Mejilla-Romero’s mother and maternal aunt. The mother was not in Honduras at the time of the incidents with petitioner and had no firsthand knowledge of the encounters. The aunt had left Honduras in 1998. She did not appear for scheduled cross-examination on what was to have been her second day of testimony; the IJ took her absence into account. The IJ considered the testimony of both the mother and the aunt, as his opinion shows.
At the close of proceedings in November 2006, the IJ observed that “given the amount of material and evidence” it “ma[de] sense to do a written decision.” In a twenty-page written decision on *67 March 5, 2007, the IJ allowed MejillaRomero to file his asylum application late[1] and rejected the application for relief.
The IJ deemed Mejilla-Romero’s own testimony credible and found that he had a subjective fear of returning to Honduras. The IJ found, however, that Mejilla-Romero had not established either past persecution or that his mistreatment was based on one of the statutory grounds. As a result, no presumption of future persecution arose. The IJ further found that MejillaRomero had not carried his burden of showing an objectively reasonable fear of future persecution on any of the statutory grounds.
The IJ comprehensively reviewed the testimony of Mejilla-Romero’s mother, devoting more than four pages of the decision to thoroughly reciting her account. Mejilla-Romero’s mother had left Honduras for the United States in 1994, fearing that her violent, sexually abusive boyfriend would kill her if she remained in that country. No evidence connected that boyfriend — who was not Mejilla-Romero’s father — with the encounters Mejilla-Romero had. The mother applied for asylum, but her application was denied. As of March 2007, she had Temporary Protected Status.
Among the testimony addressed by the IJ was the mother’s description of her family’s history of “being ‘persecuted’ on the basis of their involvement in ongoing property disputes.” The IJ’s decision noted several incidents of serious violence against the family described by the mother, including the killing of her step-father by a hired “soldier” and the murder of her brother by a relative of Hubert’s, which occurred after she had left Honduras. It also cited her testimony that she would not consider living elsewhere in Honduras in part “because she is uncertain as to where she would reside.”
The IJ’s decision detailed specific inconsistencies in the mother’s testimony. For instance, the IJ noted that the mother had initially said that Mejilla-Romero’s grandmother had told her in a telephone conversation that Mejilla-Romero was at risk from Hubert and the gangs, but later testified that she only learned the reasons why Mejilla-Romero left Honduras when Mejilla-Romero described them to her upon his arrival in this country. The IJ further observed that the mother “initially testified that she belonged to [an organization called] ‘Lined,’ but later testified that ‘Lined’ was an organization of wealthy individuals who did not want ‘poor people’ such as [Mejilla-Romero’s grandmother] to reside on their land.”
The IJ also summarized the aunt’s testimony, which described her family being “targeted” over a land dispute and referenced the murder of her bi’other by a neighbor, as a consequence of such disputes. The IJ noted inconsistencies in the aunt’s testimony, observing that she had stated that her family was a member of “Lined” but also that the group had targeted her family and that the man who murdered her brother had been a member of the organization. The aunt never applied for asylum but received Temporary Protected Status in 1999.
The IJ found that Mejilla-Romero’s mother’s testimony was “often unclear” *68 and marred by “numerous inconsistencies as compared to her [own] Application for Asylum,” but that it still “generally corroborated” Mejilla-Romero’s narrative. The IJ did not otherwise make explicit credibility findings regarding the mother’s or aunt’s testimony.
The IJ explicitly took into account Mejilla-Romero’s “age at the time these events occurred,” and noted that “[bjehaviors that an adult may not typically associate with persecution or serious harm may produce lasting damage or physical and psychological trauma in a child and thus constitute persecution.” The IJ did not reject any of Mejilla-Romero’s testimony on the basis of it having been overly basic or simplistic.
Even allowing for Mejilla-Romero’s credibility and the special consideration as to children, the IJ found that MejillaRomero’s bad experiences in Honduras, while “without a doubt, troubling,” did not rise to the level of “persecution.” The IJ cited our holdings that “to qualify as persecution, a person’s experience must rise above unpleasantness, harassment, and even basic suffering, Nelson v. INS, 232 F.3d 258, 263 (1st Cir.2000), and consist of systemic mistreatment rather than a series of isolated events. Bocova v. Gonzales, 412 F.3d 257, 263 (1st Cir.2005).” Against this backdrop, the IJ held that the encounters described “amount[ed] to no more than a series of isolated altercations with a disgruntled neighbor and ... a group of boys who bullied younger children.” The IJ explicitly considered the psychologist’s report[2] but concluded that the trauma Mejilla-Romero had experienced was not shown to be connected to Hubert or the gang, particularly given the trauma Mejilla-Romero suffered as a young child traveling unaccompanied to the United States. He found insufficient evidence of causation from the experiences in Honduras as to rise to the level of past persecution.
The IJ further found, as an independent ground, that there was no evidence that Mejilla-Romero “was ever physically pun *69 ished for possessing a belief or characteristic that others sought to overcome.” (emphasis added).
The IJ also determined that MejillaRomero had failed to establish an objectively reasonable fear that he would suffer future persecution in Honduras. MejillaRomero testified he feared he would be living on the streets and would be killed by the “boys” and “the neighbors.” However, as the IJ observed, he also testified that his grandmother was living with “various relatives” in Honduras and that his father had returned to that country as well. The IJ noted that Mejilla-Romero had offered no testimony “as to whether his father and grandmother ... have encountered any difficulties with ‘Hubert’ or with ... gangs who may still wish to recruit” MejillaRomero. Accordingly, the IJ found that Mejilla-Romero’s own “testimony — combined with his failure to be forthcoming about the whereabouts of his father— greatly undercut ] whether [he] objectively fear[ed] ‘living on the streets’ or future persecution at the hands of ‘Hubert’ and the ... gangs.”
The IJ independently found it likely Mejilla-Romero “could either reside with his father or grandmother or relocate” to another area and successfully avoid Hubert and the gangs. The IJ cited to several reports in the record that reflected Honduras’s “pervasive gang problem” and other social issues. However, the IJ also noted specific State Department and Amnesty International reports, submitted by petitioner, which reflected the Honduran government’s commitment to “children’s rights and welfare” and emphasized the Honduran government’s progress in investigating crimes victimizing children. Since Hubert’s family lived in Arimis, and a State Department report indicated that Honduran gang membership “is primarily confined to [two] large urban centers,” the IJ found that Mejilla-Romero could mitigate the risks he faced by “safely relocating]” elsewhere in Honduras. The IJ rejected the future persecution claim and the claim that it was likely petitioner would be subject to torture.
In addition, the IJ determined that Mejilla-Romero’s failure to carry the “lesser burden” of proving his asylum claim meant he had failed to meet the more exacting requirements for withholding of removal. The IJ also concluded that although there could be a risk that Mejilla-Romero would encounter violence in Honduras, this threat was not sufficiently extreme to qualify him for CAT relief.
The BIA rejected Mejilla-Romero’s appeal in a two-page opinion issued on September 25, 2008. The BIA agreed with the IJ’s determination that Mejilla-Romero had “failed to meet his burden of establishing past persecution, or that he would be persecuted if returned to Honduras on account of one of the statutorily protected grounds, or tortured in the future.” It also cited two additional BIA decisions that “squarely address[ed] — and preclude[d]” the claim that Mejilla-Romero had been persecuted on the basis of his membership in a social group that consisted of young men who had resisted gang recruitment.
The BIA affirmed the IJ’s conclusion that the actions of Mejilla-Romero’s “disgruntled neighbor and a gang of youths did not rise to the level of persecution.” As a separate basis for its decision, it emphasized that Mejilla-Romero also had not shown his alleged persecution involved “some connection to government action or inaction, related to a protected ground for asylum,” as required by our caselaw. The BIA also agreed with the IJ’s holding that Mejilla-Romero’s failure to satisfy the requirements for asylum necessarily meant he had failed to meet the more stringent *70 standard for withholding of removal, and it affirmed that his failure to present “evidence establishing that it is more likely than not that he would be subject to torture upon return to Honduras” rendered him ineligible for CAT relief.
This petition for review followed.
II.
We review both the single-member BIA decision and the IJ’s decision. See 8 C.F.R. § 1003.1(e)(5); Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 20 (1st Cir.2004). We do not engage in de novo review of the record but instead evaluate Mejilla-Romero’s challenges to the IJ’s and BIA’s findings of fact under the “highly deferential” substantial evidence standard. Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir.2005). We must accept the IJ and BIA findings “so long as they are ‘supported by reasonable, substantial, and probative evidence on the record considered as a whole.’ ” Id. (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). Under this standard, we will deny the petition for review unless “any reasonable adjudicator would be compelled to conclude to the contrary.” 8 U.S.C. § 1252(b)(4)(B); see also Scatambuli v. Holder, 558 F.3d 53, 58 (1st Cir.2009). We review rulings of law de novo but “give substantial deference to the BIA’s interpretations of the underlying statutes and regulations according to administrative law principles.” Scatambuli 558 F.3d at 58.
To qualify for asylum, an applicant must establish that he “suffered past persecution or has a well-founded fear of future persecution” on the basis of “ ‘race, religion, nationality, membership in a particular social group, or political opinion.’ ” Id. (quoting 8 U.S.C. § 1101 (a)(42)(A)); see also Dias Gomes v. Holder, 566 F.3d 232, 233 (1st Cir.2009).
A finding of past persecution gives rise to the presumption of a well-founded fear of future persecution. Orelien v. Gonzales, 467 F.3d 67, 71 (1st Cir.2006). When that presumption arises, the burden shifts to the government to show that changed circumstances have eliminated the petitioner’s fear of persecution or that he may practicably avoid future persecution by relocating to another part of his country. Id.; see also 8 C.F.R. § 1208.13(b)(l)(i).
Absent any showing of past persecution, an applicant may “prevail on an asylum claim by proving ... a well-founded fear of future persecution independent of any presumption.” Orelien, 467 F.3d at 71. To do so, he must demonstrate that his fear is both subjectively genuine and objectively reasonable. Id.
The term “persecution” has not been statutorily defined. Our precedents hold that a finding of past persecution “requires that the totality of a petitioner’s experiences add up to more than mere discomfiture, unpleasantness, harassment, or unfair treatment,” Nikijuluw, 427 F.3d at 120, a “threshold [that] is not easily crossed,” Orelien, 467 F.3d at 71. In addition, there is a separate requirement that an applicant qualifies for asylum “only when he suffers persecution that is the direct result of government action, government-supported action, or government’s unwillingness or inability to control private conduct.” Nikijuluw, 427 F.3d at 121; see also Dias Gomes, 566 F.3d at 233; Raza v. Gonzales, 484 F.3d 125, 129 (1st Cir.2007); Orelien, 467 F.3d at 72; Galicia v. Ashcroft, 396 F.3d 446, 448 (1st Cir.2005). Applying these principles, we are required to deny Mejilla-Romero’s petition.
First, the IJ’s and BIA’s determinations that Mejilla-Romero’s experiences *71 did not rise to the level of persecution were supported by substantial evidence. Both the IJ and the BIA considered Mejilla-Romero’s encounters with his neighbor and the gang, which are the source of his claims of persecution. Both determined that these isolated altercations, while unfortunate, were not sufficiently severe to meet the high bar required for a finding of past persecution. Our caselaw upholding BIA findings about what constitutes persecution supports that conclusion.[3]
While one can have sympathy for petitioner, that is not a basis on which to find the IJ and BIA were compelled to find other than they did. Bocova, 412 F.3d at 263. The IJ also found the psychological-effects evidence had not been shown to be causally connected to the mistreatment of Mejilla-Romero in Honduras, as opposed to other causes, and was insufficient to establish persecution.
The IJ’s and BIA’s supportable determination that Mejilla-Romero did not suffer from persecution is sufficient by itself to deny the petition, without reaching the question of whether the actions against him were motivated on account of one of the five statutorily protected grounds. See, e.g., Khan v. Mukasey, 549 F.3d 573, 576-77 (1st Cir.2008).
Mejilla-Romero asserts that the IJ and BIA erred in concluding that he had not met his burden to prove the “on account of’ prong. He argues that the BIA mischaracterized the nature of the attacks against him and his family, overlooking a purportedly decades-old political dispute between the family and its neighbors, as well as the types of violent gangs that operate in Honduras. The IJ and BIA did reject the claim that the treatment Mejilla-Romero received in Honduras had a political motivation and that was also supported by substantial evidence. This, too, provides an independent ground on which we must deny the petition.
The evidence does not establish, much less compel, the conclusion that MejillaRomero has drawn the necessary connection to one of the five grounds. MejillaRomero’s testimony contained no clear explanation for the motivation for Hubert’s behavior and certainly did not link it to any political feud between Hubert’s family and his own. Hubert lived with his aunt, who owned the neighboring property. Mejilla-Romero testified only that he had heard Hubert call his family “[cjommunists” and describe them as “[pjeople that are dying, that are starving.”[4] Nothing *72 compelled the IJ or the BIA to conclude that these statements signaled that Hubert’s motivations were based on the political beliefs of petitioner or his family, or on retaliation.
Nothing in the testimony of the mother or aunt, or other evidence, compels a different conclusion. The IJ did not make a credibility determination regarding Mejilla-Romero’s mother’s and aunt’s statements beyond noting the flaws in his mother’s testimony and observing that her account nonetheless “generally corroborated” Mejilla-Romero’s testimony. However, the IJ thoroughly detailed both the mother’s and the aunt’s testimony, including statements that ostensibly linked Mejilla-Romero’s encounters with Hubert to a broader history of politically motivated conflict between their families. Although the IJ plainly considered this testimony, the IJ’s decision reflected its determination that neither Hubert’s nor the gang’s actions linked Mejilla-Romero’s experiences to a political feud.
Neither Mejilla-Romero’s mother’s “unclear” and “inconsisten[t]” account, nor his aunt’s incomplete and sometimes-inconsistent testimony compel the conclusion that Hubert’s acts were part of a larger pattern of attacks on account of the political opinions of petitioner’s family. Both the IJ and BIA implicitly rejected those portions of Mejilla-Romero’s mother’s and aunt’s narratives that indicated Hubert’s actions toward petitioner were part of a broader dispute concerning the political beliefs of petitioner or his family.[5]
Similarly, the IJ’s and BIA’s conclusion that the particular gang Mejilla-Romero encountered consisted of teenaged gang members whose motivation was to steal his money — not to recruit him — was amply supported by Mejilla-Romero’s own testimony. That conclusion alone breaks any connection to an argument positing that the cause of petitioner’s experience with the gang is that he belonged to a particular social group, a protected ground.
Even if Mejilla-Romero had shown the attacks were motivated by his resistance to gangs and gang recruitment, which he did not do, that would not help his case. Mere refusal to join a gang does not constitute political opinion. Matter of E-A-G-, 24 I. & N. Dec. 591, 596 (BIA 2008). In seeking judicial review, MejillaRomero argues the BIA was required to find he was a member of a particular social group because of his purported resistance to recruitment and antigang political opinions. As the BIA held, any claim that *73 Mejilla-Romero was specifically targeted on the basis of his membership in a protected “social group” comprised of individuals who resisted joining gangs is squarely precluded by BIA precedent on the definition of “social group.” The BIA correctly cited to its precedent. See Matter of S-E-G-, 24 I. & N. Dec. at 594-95 (declining to find “persons resistant to gang membership” a social group for purposes of a Honduran asylum petitioner’s persecution determination); Matter of S-E-G-, 24 I. & N. Dec. 579, 583-88 (BIA 2008) (holding that a proposed social group “consisting] of young Salvadorans who have been subject to recruitment efforts by criminal gangs, but who have refused to join ... fail[ed] the ‘social visibility’ test and d[id] not qualify as a particular social group”).
Mejilla-Romero argues that this analysis was insufficient as a matter of law to permit judicial review and that, in any event, the BIA’s definition of social group is based on legal error. The first argument is utterly without merit, as we detail below. As to the second argument, he asserts that these BIA decisions erred in using a “social visibility analysis” and “abandoned, without explanation” the method of social group analysis first articulated in Matter of Acosta, 19 I. & N. Dec. 211 (BIA 1985). That argument, too, is without merit. The decisions on which the BIA relied explained the reason for the BIA’s actions. They are built on a body of BIA precedent that integrated consideration of “particularity” and “social visibility” into social group determinations, as a means of “giv[ing] greater specificity to the definition of a social group, which was first determined in [Acosta].” Matter of S-E-G-, 24 I. & N. Dec. at 582 (collecting cases). And the argument ignores First Circuit law, which is expressly to the contrary. We have explicitly affirmed the relevance of the social visibility inquiry to social group analysis. Faye v. Holder, 580 F.3d 37, 41 (1st Cir.2009); Scatambuli, 558 F.3d at 59-60. There was no legal error in the BIA’s analysis.
Petitioner’s claim fails, as well, for another reason. As the BIA found, Mejilla-Romero did not show that the Honduran government was in any way involved in either the incidents with his neighbor or his encounters with the street gang, the bases for his purported “persecution.” Nor did he present any evidence[6] that the Honduran government was unwilling to prosecute his assailants. In fact, he testified that, to his knowledge, no effort had been made to contact the authorities about the mistreatment he received, and there was no evidence that the authorities were aware of the attacks. Failure to inform law enforcement of threats or attacks a petitioner claims to have suffered is material to the rejection of claims of government participation or complicity in past persecution. See, e.g., Dias Gomes, 566 F.3d at 233 (holding the petitioners’ failure to inform Brazilian police of gang threats “sever[ed] the threats from any action or inaction of the government of Brazil”); Castillo-Diaz v. Holder, 562 F.3d 23, 27-28 (1st Cir.2009) (upholding Id’s determination that petitioner’s failure to report a rape that occurred when she was fifteen years old precluded her claim of government involvement in the attack, while noting IJ’s consideration of evidence “that the government of El Salvador has the power to prosecute rape cases and attaches a signif *74 icant penalty to a conviction for rape”); Galicia, 396 F.3d at 448 (finding the petitioner’s failure to contact authorities after beating was a basis for holding that petitioner “did not show that the harassment he suffered was by the government or a group the government could not control”).
Mejilla-Romero urges that the failure to contact authorities should not bar his claim of past persecution; he claims to fall into an exception. He argues that efforts to involve authorities are unnecessary when it is clear from the record that they “would have been unable or unwilling” to help. See In re S-A-, 22 I. & N. Dec. 1328, 1335 (BIA 2000). The argument again misses the mark. The BIA supportably found that what Mejilla-Romero suffered did not amount to persecution and further that he did not establish the government was unable or unwilling to help him.
The IJ recognized there had been “severe critici[sm]” of the Honduran government’s antigang measures. But the IJ also cited specific reports in the record, which indicated that the Honduran government was committed to combating gang violence and promoting child welfare, as well as Mejilla-Romero’s testimony that he did not know if the incidents with Hubert had been reported to the police and that no one had contacted the authorities regarding his experiences with the gang. Moreover, although the IJ did not discuss this point, record evidence showed that Honduran authorities had previously intervened on the family’s behalf, indicting Mejilla-Romero’s uncle’s killer and issuing a warrant for his arrest.[7] Mejilla-Romero’s emphasis on flaws in Honduras’s criminal justice system does not alter the fact that the IJ’s determination was supported by substantial evidence.
The IJ’s and BIA’s findings that Mejilla-Romero lacked a well-founded fear of future persecution were also supported by substantial evidence. As the IJ held, the fact that Mejilla-Romero’s father, his grandmother, and members of his grandmother’s family reside in Honduras undercuts the objective reasonableness of Mejilla-Romero’s fear that he would suffer persecution as a “street child”[8] or “at the hands of ‘Hubert’ and the ... gangs.” Mejilla-Romero did not testify as to whether any of his relatives who remained in Honduras faced ongoing difficulties with Hubert or the gangs. The fact that a petitioner’s family members “continue to live in relative safety” in his country of origin is relevant to an IJ’s finding of failure to establish a well-founded fear of persecution. Budiono v. Mukasey, 548 F.3d 44, 50 (1st Cir.2008); see also Aguilar-Solis v. INS, 168 F.3d 565, 573 (1st Cir.1999) (“Without some explanation, the fact that close relatives continue to live peacefully in the alien’s homeland undercuts the alien’s claim that persecution awaits his return.”).
In addition, the IJ found MejillaRomero could relocate safely elsewhere to avoid gang violence. Mejilla-Romero’s argument that the government failed to produce evidence that he could safely relocate *75 elsewhere within Honduras misplaces the burden of proof. Having failed to show that he suffered past persecution, it was Mejilla-Romero’s burden to demonstrate that he could not avoid future persecution by moving to another part of Honduras. See Orelien, 467 F.3d at 71. Substantial evidence supported the IJ’s and BIA’s determinations that he had not done so, since internal relocation could avoid both Honduran street gangs, which are “primarily confined” to particular urban areas, and “difficulties with ‘Hubert,’ ” which “all occurred in and around Arimis.”[9]
An argument is made that the IJ failed to consider the evidence in the record beyond Mejilla-Romero’s own testimony. However, the IJ’s lengthy written decision proves otherwise. The IJ thoroughly reviewed the testimony of Mejilla-Romero, his mother, and his aunt. The decision listed the extensive documentary evidence in the record and noted that the IJ had “considered all of the testimony and all of the documentary evidence in support of [Mejilla-Romero’s] requests for relief from removal.”
The IJ’s attention to the documentary evidence was apparent in his analysis of Mejilla-Romero’s claim. The decision explicitly cited, engaged with, and relied on a wide range of exhibits, including: MejillaRomero’s application for asylum, his mother’s application for asylum, his birth certificate, copies of his aunt’s and uncle’s death certificates, documents pertaining to the deportation of his father, a photograph of the scar on Mejilla-Romero’s leg, affidavits on conditions in Honduras, numerous country reports, and the psychological evaluation. This far-reaching consideration by the IJ of the record is sufficiently clear to facilitate our review of the decision and demonstrates to the court that the IJ’s ruling had a supportable basis in the record as a whole. See Pan v. Gonzales, 489 F.3d 80, 87 (1st Cir.2007) (“Although an IJ may not simply ignore substantial testimonial and documentary proof, she need not discuss ad nauseam every piece of evidence. So long as the IJ has given reasoned consideration to the evidence as a whole, made supportable findings, and adequately explained her reasoning, no more is exigible.”) (internal citation omitted).
Mejilla-Romero’s related assertion that the BIA failed fully to articulate the basis for its decision is also without merit. Mejilla-Romero presented essentially the same arguments to the BIA regarding the nature of the threats he faced from his neighbor and the street gang that he now makes to us. The BIA “is not required to dissect in minute detail every contention that a complaining party advances” and need only frame “its decision in terms adequate to allow a reviewing court to conclude that the agency has thought about the evidence and the issues and reached a reasoned conclusion.” Raza, 484 F.3d at 128; see also Lopez Perez v. Holder, 587 F.3d 456, 460-61 (1st Cir.2009). The BIA’s adoption of the IJ’s *76 opinion and elaboration of certain points more than provided an adequate basis for review.
Because Mejilla-Romero cannot meet the less stringent standard for asylum, his arguments in support of his application for withholding of removal necessarily fail. See, e.g., Orelien, 467 F.3d at 73. So too is the record devoid of anything that would compel a fact-finder’s determination that Mejilla-Romero would “more likely than not ... be tortured if removed” to Honduras. 8 C.F.R. § 208.16(c)(2).
We are bound by strict standards of review. We may not grant the petition unless the evidence compels a conclusion different from that reached by the IJ. We are forbidden from engaging in de novo review or acting as though we were the IJ hearing the case.
The petition for review is denied.

. The IJ found that "extraordinary circumstances” justified Mejilla-Romero's failure to timely file his asylum application within one year of entry to the United States. See 8 C.F.R. § 1208.4(a)(5). In particular, the IJ ruled that, in light of Mejilla-Romero’s young age upon arriving in the United States, compliance with subsequent filing deadlines, and submission of "voluminous documentation” in support of his asylum application, his application would not be time-barred.

. The report was based on an assessment conducted in June 2005, shortly before Mejilla-Romero's testimony before the IJ, in support of his application for asylum. A staff psychologist in the Cambridge Health Alliance's Latino Mental Health Program evaluated Mejilla-Romero as presenting "significant symptoms of anxiety,” noting that he had nightmares about running from those who want to harm him and that he struggled with intrusive memories of past traumatic events. He was preoccupied about his grandmother, whom he had not, at that point, heard from since 2002. The report said "[t]here is no evidence of psychotic symptoms,” "[h]e is alert and oriented,” and that he had "good impulse control,” as well as "very good insight into his problems.” In addition to the experiences with Hubert and the gang, the report also noted an incident in Honduras in which Mejilla-Romero said he had a live snake thrown at him and other occasions on which he claimed to have fended off possible sexual assaults. The report did not specify who had thrown the snake or attempted to sexually assault him.
The report also discussed incidents involving Mejilla-Romero’s family two weeks earlier in their housing project in Boston, observing that Mejilla-Romero, his mother, and other siblings had been threatened, and that the family was "terrified” of violence in this country. The recent rounds of violence included his mother’s partner being attacked with a bat and having his arm broken, the family car being vandalized, and men banging on their apartment door with a bat. The family was moved to a different location.
The psychologist concluded that MejillaRomero presented "a constellation of symptoms indicative of ... Post Traumatic Stress Disorder (PTSD).” The report did not attempt to attribute the PTSD to specific events. It concluded that Mejilla-Romero was affected by ongoing post-traumatic symptoms resulting from the "traumatic experiences he was exposed to in his first eleven years of life in Honduras” and that the "extremely violent events” of the past two weeks had led to "an exacerbation of his symptoms.”

. See Ravix v. Mukasey, 552 F.3d 42, 44-46 (1st Cir.2009) (holding that incidents including being "struck in the head by a stone” and threatened at gunpoint did not rise to the level of past persecution); Santosa v. Mukasey, 528 F.3d 88, 92-93 (1st Cir.2008) (holding that a series of incidents in which the Indonesian petitioner was targeted for his Chinese ethnicity, including being bullied as a child and adolescent, attacked by a group of ten people as a teenager, having rocks thrown at his store, and having his car destroyed, did not rise to the level of past persecution); Susanto v. Gonzales, 439 F.3d 57, 59-60 (1st Cir.2006) (holding that "ugly, discriminatory, and regrettable” incidents, including "vandalization of the family home,” a failed sexual assault when the petitioner was fourteen years old, a mugging at knifepoint, the bombing of the petitioner's church, and episodes in which crowds "threatened and threw stones at [the petitioner] and her fellow worshipers” did not rise to the level of past persecution); Bocova, 412 F.3d at 263 (holding that two incidents in which the petitioner was arrested, beaten, and threatened with death did not rise to the level of past persecution).

. In Mejilla-Romero’s October 2004 affidavit in support of his application for asylum, he stated that he recalled that many of his grandmother’s neighbors were "upset” because his family had less money than the neighbors and his grandmother built her home on a "used piece of land in the neighborhood.” He also said that his family’s differences from the *72 neighbors "became even clearer” when he realized that his family flew the Liberal Party’s red flag and the neighbors flew the National Party's blue flags. These affidavit statements do not compel the conclusion that his encounters with Hubert were based on the political beliefs of Mejilla-Romero or his family. Moreover, he did not mention these events in his subsequent testimony before the IJ and indeed testified he did not know why Hubert threw stones at him or did not like his grandmother.

. The assertion of a broader political dispute depends on stringing together bits and pieces of the sometimes-confusing and internally contradictory testimony of petitioner’s mother and the incomplete testimony of his aunt. And to the extent Mejilla-Romero now argues that, in the absence of an explicit lack-of-credibility finding, we must take the mother’s and aunt’s testimony regarding the purported political feud as credible, his argument is flatly contradicted by our caselaw. See Kho v. Keisler, 505 F.3d 50, 56 (1st Cir.2007) ("We have ... rejected the proposition that aliens are entitled to a presumption of credibility on review in this court if there is no express credibility determination made by an IJ.”); Zeru v. Gonzales, 503 F.3d 59, 73 (1st Cir.2007) ("Nor is there an assumption that if the IJ has not made an express finding of non-credibility, the alien's testimony must be taken as credible.”).

. His opening brief is devoid of any citation to the record on this point. See Rios-Jimenez v. Principi, 520 F.3d 31, 39 n. 5 (1st Cir.2008) ("[Alppellant’s argument must contain '[the] appellant’s contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.' ”) (quoting Fed. R.App. P. 28(a)(9)(A)) (second alteration in original).

. The IJ’s decision included a copy of the warrant in its recitation of the documentary evidence.

. There is no need to analyze whether eighteen-year-olds are "street children” or whether "street children” suffer persecution in Honduras. Cf. Escobar v. Gonzales, 417 F.3d 363, 368 (3d Cir.2005) (rejecting an argument by younger petitioner that homeless Honduran children constituted a "particular social group” for purposes of asylum determination and explaining that “[pjoverty, homelessness and youth are far too vague and all encompassing to be characteristics that set the perimeters for a protected group within the scope of the Immigration and Naturalization Act”).

. Mejilla-Romero also argues that the BIA abused its discretion by failing to grant him humanitarian asylum, "a discretionary doctrine sometimes available even in the absence of a threat of future persecution.” Bollanos v. Gonzales, 461 F.3d 82, 86 (1st Cir.2006); see also 8 C.F.R. § 1208.13(b)(l)(iii). However, such relief explicitly requires a threshold showing of past persecution. 8 C.F.R. § 1208.13(b)(l)(iii); see also Waweru v. Gonzales, 437 F.3d 199, 205 (1st Cir.2006) (noting that humanitarian asylum “is granted only in cases of extraordinary suffering”) (internal quotation marks omitted).
Because we have found that substantial evidence supports the IJ’s and BIA's determination that Mejilla-Romero’s mistreatment did not constitute persecution, his “claim for discretionary relief necessarily also fails.” Akinfolarin v. Gonzales, 423 F.3d 39, 44 n. 6 (1st Cir.2005).